[Crim. No. 1483. Second Appellate District, Division One.—October 25, 1927.]

THE PEOPLE, Respondent, v. CARL WESTCOTT, Appellant.

M. C. Spicer and H. C. Compton for Appellant.

U. S. Webb, Attorney-General, John Flynn, Deputy Attorney-General, and James S. Howie, Deputy Attorney-General, for Respondent.

SHAW, J., *pro tem.*—After a trial upon an indictment charging him with the murder of Charles G. Westcott, the appellant was convicted of murder in the first degree, and his punishment was fixed at imprisonment for life. He appeals from the judgment and from an order denying his motion for a new trial.

Charles G. Westcott was the father of appellant, and lived in the city of Los Angeles. On this appeal it is con-

ceded that he was murdered by someone on October 20, 1926. About 8 o'clock in the evening of that day he was sitting in the living-room of his house with his wife. The doorbell rang and the deceased arose, went to the door and opened it. After opening it, he said "Oh!" immediately following which two shots were fired from the front porch; then he shut the door, said to his wife, "Call the police," and fell over backward, with a fatal wound in the abdomen. He never arose from this position, but later was lifted into an ambulance and died on the way to the hospital about one-half hour after he was shot. No witness saw the person by whom the fatal shots were fired. The evidence tending to identify the appellant as the perpetrator of the crime is entirely circumstantial, unless we except from that designation the evidence hereafter considered regarding an alleged dying declaration by the deceased.

A witness named Eldridge heard the shots and went to the Westcott house, arriving there not more than three minutes later. He got from Mrs. Westcott a towel and washed some of the blood from the body of deceased. While he was doing so, Westcott said to the witness that he was sick, but made no other statement as to his condition. Eldridge then stated that he asked the witness a question, and received an answer, but did not state the words or purport of either. Upon objection to this conversation, the jury was taken from the courtroom and in their absence the witness testified for the information of the court as to what happened between him and the deceased. During his testimony in the absence of the jury Eldridge made the following statement: "Well, during the—while I was cleaning his wounds I asked the man—they called him Mr. Westcott, although I didn't know it at the time—who shot him, to which he replied, 'Carl.' I then said, 'Carl who?' But I received no reply to that. . . . Q. By the court: Now, was this statement made by him after you had washed his wound? A. I think during the washing and probably once afterwards." After further testimony regarding the circumstances under which this conversation was had between Eldridge and the deceased and before the jury was called back into the courtroom, the court sustained the objection of appellant to the conversation on the ground that it was not a part of the *res gestae* and could not be admitted as

a dying declaration because not made under the sense of impending death. Thereupon, the jury was called back and after a few questions on unimportant matters in direct examination, the witness was cross-examined by appellant's counsel. Upon the cross-examination the following occurred:

"Q. Until after you had finished bathing or attending the wounded man, dressing the wounds of the deceased—or the injured man,—the injured man had not said anything to you or spoken to you, had he? A. He had spoken to me before I had cleaned the wounds, before I had finished cleaning the wounds.

"Q. Well, now, you testified before the coroner's inquest, didn't you? A. I did."

The witness was then shown a transcript of the testimony taken at the coroner's inquest, and asked to read a certain passage in it, identified in the question by line and page, and after doing so said that he so testified. Thereupon the following occurred:

"Mr. Spicer (Counsel for Appellant): May I read it in evidence, your Honor?

"The Court: Yes.

"Mr. Spicer (Reading): 'Q.—Did you say anything to him or did he say anything to you? A—Not at that time. I went into the room and opened his shirt and his undershirt, and asked whom I presume was Mrs. Westcott for a damp cloth. Soon after she brought me a cloth, but as it looked soiled, I asked her for a cleaner one. As she started to obtain this, I followed her to the linen closet and obtained myself a clean towel, which I moistened and then returned to the deceased and cleaned his wounds. Soon after that, I would say approximately one or two minutes after I finished cleaning the wound, I asked the deceased who shot him. At first he mumbled, as he apparently had quite a little trouble in articulating, but finally mentioned'—and so forth.

"Mr. Hill: Oh, no, finish it, you have offered it—'finally mentioned the name Carl.'

"Mr. Spicer: —'finally mentioned the name Carl.' Very well. That is all."

Later, Eldridge was recalled by the prosecution and testified as follows:

"Q. Mr. Eldridge, referring to the time when you were in the Cochran house, 909,—the house of Mr. Westcott,—and referring to your testimony that you asked the question, 'Who shot you?' what, if any, reply was made by Mr. Westcott?

"Mr. Spicer: That is objected to as not proper examination; not proper rebuttal; no foundation being laid for its introduction.

"Mr. Hill: We are offering the witness for further examination in chief, if your Honor please.

"The Court: It appearing that this particular conversation is the one that you referred to yesterday, I take it?

"Mr. Hill: Yes, sir.

"Mr. Compton: I object to that as having already been testified to.

"The Court: The objection is overruled, limiting it to only that one conversation.

"Mr. Hill: You may answer.

"A. The answer was 'Carl.'

"Q. And who made that answer? A. Mr. Westcott."

After the cross-examination of Eldridge the prosecution called as a witness John Wesley Smith, who testified that he accompanied Eldridge to the Westcott house on the night of October 20th, and further testified as follows:

"Q. Did you hear Mr. Eldridge say anything to Mr. Westcott? A. I did.

"Q. What did you hear him say?

"Mr. Spicer: That is objected to as hearsay, no proper foundation having been laid, incompetent, not part of the *res gestae*.

"The Court: That objection will be overruled.

"A. Either 'Who shot you,' or 'Who did it?'

"Q. By Mr. Dennison: Did you hear Mr. Westcott make any reply? A. I did.

"Mr. Compton: Now, if the court please, we object to that—

"The Court: Objection overruled: The answer 'I did' may stand.

"By Mr. Dennison: What did you hear Mr. Westcott say in reply to that question?

"Mr. Spicer: That is objected to on all the grounds heretofore made as to the admissibility as a dying declaration, or admissibility as part of the *res gestae*.

"The Court: By reason of the fact that this particular conversation has gone into evidence by way of a recital yesterday afternoon, the People, I take it, have a right to show the truth or falsity of that statement as already in evidence. The objection is now overruled to that one conversation only as to Eldridge.

"Q. By Mr. Dennison: You may answer the question.

"A. 'Carl.'

"Mr. Spicer: I move that that answer be stricken from the record for the reason that it is not introduced nor shown to have been introduced, for the purpose of contradiction, it being the same answer that was shown by the record that was introduced as an impeaching question, and for the further reason it is hearsay, incompetent, no foundation having been laid for its introduction.

"The Court: Motion to strike out denied. . . .

"Q. Did you see what Mr. Eldridge had been doing just previous to asking the question? A. Yes, sir.

"Q. What was Mr. Eldridge doing?

"A. He was trying to stop the bleeding.

"Q. In what way? A. He had a cloth in his hand."

Appellant complains that the court erred in admitting the testimony of Smith and in refusing to give an instruction requested by appellant as to the purpose for which it was admitted, and also that the district attorney was guilty of prejudicial misconduct by the use he made in his argument of the testimony given by Eldridge before the coroner's jury.

Had the court, on a proper showing that deceased spoke under a sense of impending death, allowed Eldridge to testify as to the conversation between him and the deceased, the exact time or stage of the transaction at which this conversation occurred might have been material, but upon the court's refusal to permit this testimony, there was no other phase of the case to which an inquiry as to the time of the conversation could relate. The question whether the conversation occurred while Eldridge was washing the wound or afterward was therefore immaterial. Consequently appellant was not entitled to impeach any testi-

mony given by Eldridge on this question by proof of contradictory statements made by him. (*People* v. *Cole*, 127 Cal. 545 [59 Pac. 984]; *People* v. *Smith*, 189 Cal. 31 [207 Pac. 518]; 27 Cal. Jur. 107, 152.) For the same reason, the prosecution was not entitled to corroborate Eldridge on this point. ▮ "It is not permissible to corroborate a witness as to collateral, irrelevant or immaterial matters." (40 Cyc. 2784, citing cases.) This rule and the reason for it are stated in *Stevens* v. *Beach*, 12 Vt. 585 [36 Am. Dec. 359], where, after plaintiff's witness Steele had testified to an immaterial fact, a witness for the defendant testified to the contrary, and the plaintiff then offered to corroborate Steele by other witnesses. The court said: "It is no doubt competent for the party to put almost any question, upon cross-examination, which he may consider important to test the accuracy or veracity of the witness. But if the question is in regard to a fact collateral to the issue, he must be content with the answer of the witness, and cannot contradict him by independent proof. If this were allowed, a single issue would branch out into an indefinite number of collateral ones: 1 Stark. Ev. 182, 6th ed.; and authorities referred to. Hence, if in regard to any of those collateral questions, the witnesses should not agree, it is not for the reason above stated, competent for either party to adduce evidence in regard to such collateral fact. The question put to Steele, for the purpose of testing his consistency, might be perfectly competent, but the testimony given by the defendant's witnesses upon this point, as it had no tendency to prove the main issue, was not competent, and, had it been objected to, would have been rejected. Hence, as Steele could not legally have been impeached by this collateral proof, neither could he be supported in that manner."

▮ Appellant's attempt to impeach the testimony of Eldridge on this point might therefore have been prevented by a proper objection, but as none was made, the evidence was allowed. According to the authorities above cited, this would not entitle the prosecution to corroborate him upon this point, and the court therefore erred in ruling that the testimony of Smith and also that of Eldridge when recalled was admissible for that purpose. Even if such corroboration had been proper, the ruling would nevertheless have

been erroneous. The point, if any, upon which Eldridge was impeached by his testimony given at the coroner's inquest was as to the stage of the proceedings at which he talked with the deceased, and we doubt if he was even impeached on this point, to any substantial extent. He had given no testimony before the jury trying this case as to the declaration made to him by the deceased. That was presented to the jury for the first time in the supposed impeaching statement read by appellant's counsel from the testimony at the inquest. Smith, in the testimony to which the objection was made, said nothing about the time at which this declaration of deceased was made, nor did Eldridge when recalled; and as to the latter, it is difficult to understand how he could corroborate himself. Hence, these two items of testimony could not be admitted to corroborate Eldridge.

This conclusion renders it necessary to inquire whether the court was right in its original ruling that no sufficient foundation had been laid for the admission of the declaration of deceased to Eldridge, either as a part of the *res gestae*, or as a dying declaration. If it should have been admitted for either of these reasons, we are not concerned with the fact that the court assigned a wrong reason for its ruling in admitting it.

As to the matter of *res gestae*, little need be said. The declaration in question was made by the deceased after he had shut the front door, and his assailant had fled, and was in response to a question of Eldridge, who arrived at the scene after an interval during which deceased was unconscious and his wife had telephoned for the police and a doctor, and had then attempted to get deceased to recognize and speak to her. It was not the natural and spontaneous outgrowth of the murderous assault upon him, but a mere narrative of a past transaction and hence not a part of the *res gestae*. (Code Civ. Proc., sec. 1850; 8 Cal. Jur. 95; *People* v. *Hinshaw*, 194 Cal. 1 [227 Pac. 156]; *People* v. *Murphy*, 28 Cal. App. 708 [153 Pac. 732].)

We think it must also be held that the statement of deceased was not admissible as a dying declaration. To be admissible as such, a declaration must have been made under a sense of impending death. (Code Civ. Proc., sec. 1870, subd. 4.) It was shown by the surgeon who per-

formed an autopsy on the body of deceased that there were two gunshot wounds, one in the leg and one in the abdomen. The bullet which made the latter wound entered the body in front and passed through the liver, the stomach, and the first lumbar vertebra, grazing the spinal cord and causing profuse internal hemorrhage. The surgeon testified that such a wound would have caused death in a very few moments, and that as a rule there would be unconsciousness or collapse immediately; that there would be paralysis from the hips down, and the brain would be affected almost immediately by shock reaction; that unconsciousness would probably result in ten minutes or less, depending upon the vitality of the victim, but in the meantime he could make a statement with realization of what he was saying and answer questions intelligently. The evidence also showed that when deceased was shot, he at once told his wife to call the police, then shut the door and fell backward on the floor, from which position he never got up; that after telephoning for the police and a doctor, his wife came back to him and found him unconscious, breathing heavily and bleeding profusely and thought he was dying. She kissed him and spoke to him, but he made no response. This was before Eldridge came in. Eldridge testified that he reached the deceased in from one to three minutes after he heard the shots; that deceased was then moaning, but not loudly; that just as he finished cleaning the wound, deceased raised himself on his elbow and said: "I am sick," but said nothing more as to his condition; that this occurred both before and after the question and answer as to who shot him; that at the time of these statements he seemed conscious, but his powers of articulation were not of the best because he would kind of clear his throat from time to time; and that the wound was so located that deceased could not see it very well. Eldridge could not fix the time that elapsed between the shots and his conversation with deceased, but said it was not more than one-half an hour. Consideration of the intervening events indicates that it was considerably less. No other facts were shown which could throw any light on the question whether deceased knew that he was about to die.

The evidence most frequently received to show a sense of impending death is the statement of the declarant him-

self, tending to show such a state of mind on his part. In this case there is nothing of the kind. The only statement made by deceased as to his condition was "I am sick," and this falls far short of showing that he realized his dying condition. No argument has been made on this subject in the briefs, both sides having apparently considered that this appeal could be disposed of without its consideration, but fortunately the record contains a full report of the elaborate argument made on this point by the People in the lower court. It was there ably and elaborately argued that the nature of the wound itself, together with the other facts shown as to the conduct and condition of the deceased, was sufficient to show that he knew he was about to die.

In Greenleaf on Evidence, section 158, the rule is stated as follows: "It is essential to the admissibility of these declarations, and is a preliminary fact, to be proved by the party offering them in evidence, that they were *made under a sense of impending death;* but it is not necessary that they should be stated at the time to be so made. It is enough if it satisfactorily appears in any mode, that they were made under that sanction; whether it be directly proved by the express language of the declarant, or be inferred from his evident danger, or the opinions of the medical or other attendants, stated to him, or from his conduct, or other circumstances of the case, all of which are resorted to in order to ascertain the state of the declarant's mind." This statement has been cited or quoted with approval in many California cases. (*People* v. *Ybarra,* 17 Cal. 166, 168; *People* v. *Sanchez,* 24 Cal. 17, 24; *People* v. *Gray,* 61 Cal. 164, 175 [44 Am. Rep. 549]; *People* v. *Bemmerly,* 87 Cal. 117, 118 [25 Pac. 266]; *People* v. *Taylor,* 59 Cal. 640, 646; *People* v. *Yokum,* 118 Cal. 440 [50 Pac. 686].) In *People* v. *Hoffman,* 195 Cal. 295, 307 [232 Pac. 974], substantially the same rule is declared. In 2 Wigmore on Evidence, section 1442, the author says: "In ascertaining this consciousness of approaching death, recourse should naturally be had to all the attending circumstances. It has been contended that only the statements of the declarant could be considered for this purpose; or, less broadly, that the nature of the injury alone could not be sufficient, i. e., in effect, that the declarant must have shown in some way by conduct or language that he knew he was going to die.

This, however, is without good reason. We may avail ourselves of any means of inferring the existence of such knowledge; and, if in a given case the nature of the wound is such that the declarant must have realized his situation, our object is sufficiently attained. Such is the settled judicial attitude.''

In all the California cases above cited there were in fact other circumstances, or statements of the declarant, in addition to the nature of the wound, tending to show that the declarant knew and realized his condition. We find no California case in which it is directly held that the nature of the wound alone is sufficient to show that the wounded person believed himself about to die. The court, however, said in *People* v. *Ybarra, supra:* ''We think the circumstances of the case, as shown by the witnesses, warranted the admission of the testimony. The evident danger of such a wound as that shown, with the immediate effect upon the victim produced by it, even unaccompanied by the other circumstances corroborating the idea of her sense of her true condition, would probably have been sufficient to admit her declarations, but with the other circumstances, they leave no doubt as to the propriety as to the admission.'' The statement as to the facts is very meager, but it appears that the deceased at the time of making the declarations was lying down, suffering very much from the effects of a mortal gunshot wound received in the abdomen; that she was in great misery all the time, never was easy, and was continually failing, and also that she said she believed she was going to die. Here, of course, we have the express statement of the declarant as to her condition, and it also seems that she must have known the nature and effect of the wound. In *People* v. *Sanchez, supra,* the court said: ''The character of his wounds—his suffering and pain— the opinion of the surgeon or other attendants as to his condition, if stated to him—his alarm and anxiety, if manifested—his final preparation for death, if any was made— his taking leave of friends—his seeking the consolations of religion and the last offices of the church, if such was the case—are all circumstances which are frequently quite as satisfactory in determining the questions of belief as any express statement on the part of the declarant.'' The circumstances thus referred to, other than the express state-

ment of the declarant, were all present in that case, and the court held the declarations properly received, but here again the knowledge of the declarant as to his condition clearly appears.

The question as to what facts will justify a finding that the declarant was under a sense of impending death, in the absence of a statement by him to that effect, has received consideration in many cases from other jurisdictions which are collected and reviewed in extensive notes found in 56 L. R. A. 406, 30 L. R. A. (N. S.) 396, and Ann. Cas. 1912C, 85. An English authority which has been often cited is *John's Case,* reported in 1 East P. C. 357, where it was held: "That if a dying person either declare that he knows his danger, or it is reasonably to be inferred from the wound or state of illness that he was sensible of his danger, the declarations are good evidence." In this case, however, where the wounds were bruises and contusions from blows and kicks, it was held that there was no foundation for supposing that the deceased considered herself in danger.

The cases that most nearly resemble the case at bar in their facts are: *Territory* v. *Eagle,* 15 N. M. 609 [Ann. Cas. 1912C, 81, 30 L. R. A. (N. S.) 391, 110 Pac. 862], and *Jones* v. *State,* 130 Ga. 274 [60 S. E. 840]. In the New Mexico case it appeared that the deceased did not indicate at any time by word of mouth or otherwise that he realized his condition and had no hope of recovery, and nothing was said to him by anyone on this subject. He had been shot, the bullet entering his body from the front, traversing his abdomen and coming out in the back. There was severe internal hemorrhage. On the next day after he was shot there was a discharge of the intestinal contents from the wound, his abdomen was markedly distended, his temperature subnormal and his pulse rapid; he was conscious, but in a rather dazed condition, and he could retain nothing in his stomach, but was vomiting blood. The declarations were made after these symptoms appeared, and although the time intervening between the shooting and the declarations was not stated, it must have been at least several hours. The court quoted from Wigmore on Evidence, the language which we have already quoted, and held that the declarations were admissible. In this case it is clear that the declarant had ample opportunity to observe the

nature and extent of his wounds and the effect caused on him thereby, and he could hardly have failed so to do. In the Georgia case the deceased was found by his wife a short time after he was shot, and he neither did nor said anything expressly indicating a sense of impending death, but the court said: "In this case, the fact that when his wife found him the deceased was prostrate on the ground; that he was shot through the heart; that he was unable to get one of his arms to the shoulder or neck of his wife, who was assisting him to his home; that he never spoke again after the words complained of were uttered, and that he died in fifteen or twenty minutes after making the statement, were circumstances from which the jury might infer that when he made the declarations he was in the article of death and conscious of his condition." It is apparent here that the deceased at least knew of his inability to help himself.

Another somewhat similar case is *Anthony* v. *State,* Meigs (Tenn.), 265 [33 Am. Dec. 143], where it appeared that the wound was a large pistol shot entering the navel, and such a wound ninety-nine times in a hundred would produce death; that when the declaration was made the declarant was in the opinion of her physician fast sinking, but neither he nor anyone else informed her of this fact; that she said she was suffering from great pain, burning heat and great sickness of the stomach. The court quoted from *John's Case, supra,* the language we have already stated and added what we conceive to be the true rule as to the meaning of such statements as that made in *John's Case* and the one made in the passage we have above quoted from Greenleaf regarding the "evident danger" of the deceased, in the following language: "It is obvious that this rule or principle, so distinctly stated, does not mean that the inference may be drawn from the mere fact that the wound, in the opinion of the man of science, was in point of fact mortal; but that the nature of the wound or the state of illness should be such as to affect the knowledge, and control the opinion of the dying person himself, as to the danger to which he stands exposed. . . . In the case before us, the dreadful nature of the wound, the state of illness as proved by the physician and declared by the deceased herself, were such as could not leave her or any rational being

in doubt as to her being in great danger of immediate death.''

In the case now before us the deceased, after being shot, almost immediately fell over backward and became unconscious. There is no ground to suppose that before consciousness intervened he became aware of the mortal nature of his wounds. After he revived, his only express indication of his knowledge as to his condition was to moan slightly and say, ''I am sick.'' Since he could not see the wound, he could have gained no knowledge from an inspection of it. He may have had a sense of pain, indicated by his moaning, which told him that he was wounded through the body, but such wounds are not necessarily fatal. In all of the cases which we have found after an extensive investigation, in which it has been held that a sense of impending death might be inferred from the nature of the wounds, it appeared that the wounds were of an obviously mortal character, and that this fact was known or at least was manifestly open to the observation of the declarant; e. g., in some of them it appeared that his throat had been cut from ear to ear, and his windpipe severed. In the present case, we think the court was right in its ruling that the declaration of the deceased was not shown to have been made under a sense of impending death.

It follows that there was no evidence properly before the jury regarding the declaration by the deceased that Carl shot him unless it be the testimony of Eldridge given at the coroner's inquest that the deceased made such a declaration. This was offered by appellant merely for the purpose of impeaching Eldridge, on the theory that it showed a previous contradictory statement by him. This theory was correct, if at all, only as to the time when the declaration was made and not as to the fact that it was made; and appellant endeavored to omit the latter fact when reading the testimony, but upon the insistence of the prosecution that the sentence be finished, the whole was allowed to go in without protest. We think, however, that by thus acquiescing in the demand of the prosecution that the whole sentence be read, appellant did not abandon his offer of the testimony as mere impeaching testimony, but was entitled to have the whole of it considered on the theory that he offered it for that purpose only. ''It is a settled rule

that impeaching evidence of contradictory statements does not tend to establish the truth of the matter contained therein, but may be considered only in so far as it tends to affect the credibility of the witness sought to be impeached thereby, and if a timely request therefor is made, a party is entitled to have the jury so instructed.'' (27 Cal. Jur. 169; 2 Wigmore on Evidence, sec. 1018; *Thiele* v. *Newman*, 116 Cal. 571 [48 Pac. 713]; *Albert* v. *McKay & Co.*, 174 Cal. 451, 456 [163 Pac. 666]; *Estate of Relph*, 192 Cal. 451, 458 [221 Pac. 361]; *People* v. *Corey*, 8 Cal. App. 720, 729 [97 Pac. 907].)

Certain decisions in this state might perhaps at first blush be regarded as holding to the contrary by reason of the fact that this impeaching evidence was offered by appellant, but on careful consideration we think they do not. In *Sill* v. *Reese*, 47 Cal. 294, 340, the court said: ''We are not prepared to say that counsel is bound by the declaration of a limited purpose, so as to be estopped, after the introduction of evidence, from drawing from it other deductions than that suggested by the terms of the offer. Certainly he should not be, unless injustice has been done to the opposite party by permitting such new inferences; and this cannot be made out by mere assumption or conjecture, unsupported by any fact appearing in the record. Indeed, counsel has no power to limit the effect of evidence; it would hardly be contended that the opposite party cannot use it in any *legitimate* manner before the jury. The statement of a 'purpose' is only a reason, addressed to the court, why the particular evidence should be admitted; the effect of the evidence is to be limited, in proper cases, in the charge to the jury.''

In *Sears* v. *Starbird*, 78 Cal. 225, 230 [20 Pac. 547]; the court said, after citing *Sill* v. *Reese, supra:* ''In the absence of an express understanding between counsel and the court that evidence is to be limited to a particular matter, the court will be authorized to consider it for any purpose for which it is competent and relevant to the issues.''

In *Fox* v. *Harvester etc. Works*, 83 Cal. 333, 342 [23 Pac. 295], the court said in regard to certain documents: ''We cannot see that because they were read in evidence as a part of the cross-examination of other witnesses, therefore they were not in the case for all purposes for which they

were admissible. The papers have been already put in evidence, the court did not err in refusing to allow them to be put in the second time.''

All of these cases limit the use that may be made of evidence by the opposing party to that for which it is ''legitimate,'' ''competent,'' or ''admissible.'' According to the authorities already cited, the impeaching evidence produced on the cross-examination of Eldridge was not legitimate, competent, or admissible as proof of the facts therein stated. The prosecution was therefore not entitled to use it for that purpose.

The court refused appellant's request for an instruction, No. 28, to the effect that the above-mentioned testimony of Smith was admitted for the limited purpose of impeaching Eldridge and could be considered by the jury for no other purpose. This evidence was not admitted to impeach Eldridge, but to corroborate him, and the court was justified in refusing the instruction for that reason. Instruction No. 3 given by the court, apparently of its own motion, informed the jury that the evidence of question and answer passing between Eldridge and the deceased was admitted for consideration only upon the credibility of Eldridge and directed them to consider it for no other purpose. This instruction sufficiently identified and referred to the testimony of both Smith and Eldridge, and in effect told the jury not to consider the declaration of deceased narrated in the testimony as proof of the fact declared by him. Whether the giving of this instruction cured the error in the admission of the testimony so referred to we will consider later.

Appellant also requested an instruction, No. 27, to the effect that the evidence as to Eldridge's statement at the coroner's inquest could be considered by them only for the limited purpose of impeaching Eldridge, and not as any proof of the guilt or innocence of the defendant. This instruction was refused and no instruction on this point was given, although appellant was entitled to such an instruction. As proposed by him, the instruction was perhaps misleading, for, in the final analysis, evidence which impeaches a witness may have some bearing upon the question of defendant's guilt or innocence. But the error in the proposed instruction, if any, was not sufficient to justify a refusal to give any instruction on the point under the cir-

cumstances. The court should have instructed the jury as to the true rule on this matter. (*People* v. *Frey,* 165 Cal. 140, 147 [131 Pac. 127].)

Appellant complains not only of the admission of the direct evidence as to the conversation between Eldridge and the deceased, but also of the use made of it, and also of the statement of Eldridge at the inquest, in the closing argument of the prosecution. In this argument the deputy district attorney read at length the record of the impeaching question put to Eldridge, including the statement that deceased said Carl shot him. Before this reading the following occurred:

"Mr. Hill (Deputy District Attorney): The dying man replied—

"Mr. Spicer (Counsel for Appellant): Now, your Honor, we object to counsel commenting on that for the reason it is not introduced as evidence in the case.

"Mr. Hill: That part I have stated is absolutely in the evidence in this case so far.

"The Court: The court expects to instruct the jury it is for a limited purpose.

"Mr. Hill: The fact that he spoke?

"The Court: No, not the fact that he spoke.

"Mr. Hill: That is all I have commented on so far, if your Honor please."

After reading the testimony the prosecutor commented on this declaration of the deceased and the probability of its being true for nearly three pages of the record, and thereupon the following proceedings occurred (to the proper understanding of which it is necessary to know that appellant on the night of the murder bought a copy of a newspaper, in which there was an account of the murder and a statement that he was accused of committing it, and that upon seeing this he went to the police station and surrendered):

"What else have we in the evidence in this case? Carl Westcott appears at the police station claiming that he had read in the newspaper that his father had been killed and that he was accused of having killed him. That is a fact legally established in evidence. What deduction and inference can be drawn from that? It is common knowledge that newspapers are in the business of gathering news.

They have trained reporters assigned to get the facts, write them and report them to their paper for publication. The deduction from the course of business. Why, no newspaper publishes things unless it is warranted by some investigation of theirs and an ascertainment of the facts because no newspaper likes a libel suit. And so you have got it in the evidence here that the dying man did make a dying statement that Carl shot his father; you have got it from the inference and the deduction from the facts from the evidence in this case, and you can't escape it.

"Mr. Spicer: Just a moment. I make this objection, and ask the court to withdraw this from the jury. The remarks of the newspapers, it is not in evidence. There is no testimony as to whether those statements in there were true. It is highly prejudicial. It is known to the district attorney it is prejudicial, and I believe he is making it for that particular purpose.

"The Court: The remarks of the district attorney going outside of the record will be stricken from the argument.

"Mr. Hill: May I, for the guidance of my further remarks, have the court call my attention to what particular remarks you deem objectionable in the argument? There is the evidence that a newspaper was published and Carl claimed to have seen the paper in which it was stated he was accused of the murder of his father. What was the basis of the accusation; who was present at the scene of the murder? Who of all persons alone saw the murder? He whose lips are now sealed, Charles G. Westcott, and he alone. We have it in the evidence that he did speak before his immortal soul passed from this life. We have the paper coming out stating that the defendant, the son, was accused of his murder. What is your inference and your deduction from the course of business and the course of nature; from what source possibly could the information be obtained than from the word of mouth of Charles G. Westcott that his son had murdered him? Don't you believe Charles G. Westcott? Don't you believe that of all persons in the world he was the one who knew best the features of his son? Don't you know—

"Mr. Spicer: We object to this, your Honor, again, and move the court to admonish the jury.

"The Court: The court will instruct the jury and the deputy district attorney that the means or method and course by which the newspaper—referring to a newspaper which Westcott in his statement stated that he did see on that evening—that that means of information, method and source is not in evidence, and that anything you may say on that subject is merely your inference.

"Mr. Hill: Exactly so, why, certainly. Everything I have said in my argument is my opinion of the analysis of the evidence, the same as counsel for the defense.

"The Court: Well, I don't think it proper that you should go into the source of the newspapers' information from which they made the publication, however.

"Mr. Hill: All right. I will ask the jury be instructed to disregard that part of it. Westcott testified that he read the newspaper and from the newspaper alone he had obtained the information not only of his father's death but that he, Carl Westcott, was accused of his murder. Put those facts with the other facts in this case, the other inferences and the other deductions in this case, and I say to you that the inference and the only inference warranted by this evidence is that Charles Westcott, before he died, spoke, and that counsel recognized that that was in evidence and couldn't get away from it. Mr. Compton in the closing argument for the defense referred to it and he tried to laugh it off. He tried to give another construction of it. He gave his inference of it, and what did he say? He said that if the dying man did speak the word 'Carl' it wasn't as an accusation of guilt, it wasn't accusing Carl of having murdered him, but that just as life was fluttering from the body his last earthly thought was for his loved son Carl. If that had been the fact, do you think counsel would have fought for two days and a half to keep that out of the evidence?

"Mr. Spicer: We object to that and move that it be stricken out, and I think that counsel should be instructed by the court that he is not to speak upon those subjects which he knows are not questioned to go before this jury.

"Mr. Hill: This jury is not blind. They have been out of court and in court and out again—

"Mr. Spicer: We take exception to counsel's remark on that and move the court to instruct the jury.

"The Court: The court will instruct the jury to entirely disregard the personal conversation between counsel. As to this particular evidence that is being referred to now the court expects to and will instruct you it is in for a limited purpose, impeachment, offered for that purpose, and the truth of the statements there made were permitted to be met by the other side going only to the credibility of the witness Eldridge, not for general purposes.

"Mr. Hill: Unquestionably it is before you, ladies and gentlemen, for that limited purpose of showing that at the time of the coroner's inquest Mr. Eldridge under oath at that time testified that he asked the question, 'Who shot you?' and the dying man replied, 'Carl.'

"Mr. Spicer: We object to that and take exception to counsel's remarks as prejudicial, intended so by counsel, and made for the purpose of prejudicing the jury.

"The Court: I don't know what counsel intended but if he is limiting it to matters of credibility—

"Mr. Hill: Exactly. And you can consider it for the purpose of determining whether or not Mr. Eldridge has been impeached as to the testimony given in this case."

We have thus stated the argument at some length before considering the effect of the court's instructions upon the error in the admission of the declaration of deceased in evidence, because it is apparent from this statement that the two matters must be considered together. ■ Under the circumstances of this case the error in the admission of the evidence could not be rendered harmless by an instruction from the court to consider it for a limited purpose only or to disregard it altogether. The evidence was extremely damaging to appellant. Here is a son charged with the murder of his father, and evidence is allowed to go to the jury that the father before he died accused his son of the murder. By the established legal rules governing such matters this evidence was improper. Is it possible that any jury, after hearing such evidence, in such a case, can erase it from their minds and not be influenced by the accusatory declaration, merely because the court tells them to consider the evidence only in passing on the credibility of a witness, whose credibility was, in fact, not substantially impugned thereby? We unhesitatingly answer no. In so doing we but follow the established rule in such cases. (*People* v.

*Oldham,* 111 Cal. 648, 654 [44 Pac. 312]; *People* v. *Rodriguez,* 134 Cal. 140 [66 Pac. 174]; *People* v. *Anthony,* 185 Cal. 152, 159 [196 Pac. 47]; *People* v. *George,* 72 Cal. App. 124 [236 Pac. 934].)

 Even if there had been a possibility that the jury would forget the evidence of the declaration by deceased, that possibility would have been utterly dissipated by the argument of the prosecuting attorney. That argument was entirely unwarranted by the record in many respects. There was nothing before the jury to indicate where the newspaper got its report that appellant was accused of the murder, and the argument based on that report was an entirely unjustified attempt to present to the jury something which they were not entitled to consider. The argument which we have quoted shows a persistent disregard by the district attorney of the directions and admonitions of the court, and an apparent intent so to impress the matter on the jury that they could not forget it, no matter what the instructions of the court might be. It manifests a complete departure from the spirit of fairness which should animate the conduct of that officer, and must be regarded as prejudicial misconduct. (*People* v. *Derwae,* 155 Cal. 592 [102 Pac. 266]; *People* v. *Hail,* 25 Cal. App. 342, 358 [143 Pac. 803]; *People* v. *Keko,* 27 Cal. App. 351 [149 Pac. 1003]; *People* v. *Irby,* 67 Cal. App. 520, 528 [227. Pac. 920]; *People* v. *Fleming,* 166 Cal. 356, 381 [Ann. Cas. 1915B, 881, 136 Pac. 291]; *People* v. *Tufts,* 167 Cal. 266, 273 [139 Pac. 78]; *People* v. *Anthony,* 185 Cal. 152 [196 Pac. 47].)

 There remains for consideration the question whether section 4½ of article VI of the constitution prevents a reversal of this case. With this section in mind, we have carefully considered the evidence adduced to identify appellant as the perpetrator of the crime. It is entirely circumstantial, and we see no good object to be accomplished by stating it here. While the combined effect of all the circumstances relied on to show appellant's guilt is such as to support the verdict, without the declaration of deceased, yet each of them taken separately is susceptible of an explanation consistent with appellant's innocence. Appellant attacks the credibility of the testimony by which some of these circumstances were shown, and as to some of them the evidence was conflicting. While these matters are not

for this court, yet we are unable to say how the jury regarded them, or that they may not have disbelieved the evidence as to some of the incriminating circumstances, or regarded these circumstances as insufficient, and based their verdict on the declaration of the deceased. In short, we are unable to determine whether appellant would or would not have been convicted had the testimony as to that declaration not been admitted and the argument of the district attorney thereon not been made. In such case section 4½ of article VI has no application to uphold the judgment. (*People* v. *MacPhee,* 26 Cal. App. 218, 226 [146 Pac. 522] ; *People* v. *Irby,* 67 Cal. App. 520, 530 [227 Pac. 920] ; *People* v. *Degnen,* 70 Cal. App. 567, 606 [234 Pac. 129] ; *People* v. *Black,* 73 Cal. App. 13, 38 [238 Pac. 374].)

In view of the reversal which must be ordered, certain other matters must be considered. ■ Appellant complains of the action of the court in omitting from his requested instruction No. 25 a portion thereof. The part thus omitted and refused by the court is included in parentheses in the following quotation:

"The defendant in this case has introduced evidence to prove the fact that he was not at the place where the crime was alleged to have been committed at the time charged in the indictment (and if in your deliberations you determine that the defendant was not at the place where the alleged offense is said to have been committed, at the time alleged in the indictment, but was at another place, then, under this state of facts, you must find the defendant not guilty, for it is impossible for the same person to be in two different places at the same time).

"The burden of proof is not upon the defendant to establish an alibi by a preponderance of the evidence, but it is sufficient to entitle the defendant to an acquittal in this case, if the evidence of alibi, considered in connection with all the evidence in this case, raises in the minds of the jury a reasonable doubt as to the guilt of defendant."

The portion omitted is doubtless correct, and was approved as part of an instruction given in *People* v. *Foster,* 198 Cal. 112 [243 Pac. 667], but we do not think that its refusal can be regarded as error. The meat of the portion omitted was the statement that it is impossible for the same person to be in two different places at the same time, and

this was contained in instruction No. 10, given at the request of the prosecution. Moreover, the language omitted was a mere commonplace, which would be known to any intelligent jury, and the refusal to give it cannot be regarded as error. (*People* v. *Machuca,* 158 Cal. 62 [109 Pac. 886]; *People* v. *Perrin,* 67 Cal. App. 612 [227 Pac. 924].)

Appellant also complains of the action of the court in omitting a part of his instruction No. 3, which was as follows, the part omitted being included in the parentheses:

"To warrant a conviction on circumstantial evidence each fact necessary to the conclusion sought to be established must be proven by competent evidence, beyond a reasonable doubt, and all the facts necessary to such conclusion must be consistent with each other and with the main facts sought to be proved and the circumstances, taken together, must be of conclusive nature, leading, on the whole, to a satisfactory conclusion and producing, in effect, a reasonable and moral certainty beyond a reasonable doubt, that the accused and no other person committed the offense charged (the mere union of a limited number of independent circumstances, each of an imperfect and inconclusive character, will not justify a conviction. They must be such as to generate and justify full belief according to the standard rule of certainty. It is not sufficient that they coincide with and render probable the guilt of the accused, but they must exclude every other reasonable supposition. No other conclusion but that of the guilt of the accused must fairly and reasonably grow out of the evidence, but the facts must be absolutely incompatible with innocence, and incapable of explanation upon any other reasonable supposition, than that of guilt.)"

The reference in the language which the court declined to give to the "standard rule of certainty" would have introduced into the instruction an expression of vague and uncertain meaning not heretofore approved as an accurate statement of the law in any case to which our attention has been called. We think, also, that the statement that "the mere union of a limited number of independent circumstances, each of an imperfect and inconclusive character, will not justify a conviction" is too favorable to the appellant. In support of it, appellant refers to *People* v. *An-*

*thony,* 56 Cal. 397; but we find no such instruction discussed in that case. In his brief, but in another connection, appellant also refers to *People* v. *Staples,* 149 Cal. 405, 425 [86 Pac. 886, 894], where the court said of circumstantial evidence: " . . . where the evidence is of such a character it must be not only consistent with the hypothesis of guilt, but inconsistent with any other rational hypothesis. The deduction to be drawn from these circumstances is ordinarily one for the jury, but where, in a case such as this, every circumstance relied on as incriminating is equally compatible with innocence, there is a failure of proof necessary to sustain a conviction, and the question presented is one of law for the court."

This case has been considered and reviewed in several other cases. In *People* v. *Muhly,* 15 Cal. App. 416 [114 Pac. 1017], the court said regarding it: "In the case now here the defendant presents in numerical order most, if not all, of the circumstances relied on for conviction, and endeavors to show each of these circumstances to be equally compatible with innocence, and hence there is a failure of proof necessary to sustain a conviction. The principle enunciated in the Staples case is undoubtedly proper to be given as an instruction to the jury, and it was given by the learned trial court in unmistakable terms. But we do not think it can be accepted, or was intended to be accepted, as a rule of universal application to guide the appellate court in all cases arising out of or dependent upon circumstantial evidence. It rarely happens that circumstances attending the commission of a crime may not, in the opinion of the reviewing court, reasonably be susceptible of an interpretation compatible with the innocence of the person associated with such circumstances; and if one after another of the alleged incriminatory circumstances may be eliminated, they would necessarily cease to have any probative force considered collectively. . . . As we understand the Staples case, the rule there laid down followed an analysis of the evidence from which the court was authorized to conclude that there was no evidence warranting the verdict. We do not understand that case to hold that where the circumstances are such as to reasonably justify the inference of guilt, the case will be taken from the jury because an inference of innocence might also reasonably have been drawn."

In *People* v. *Strauss,* 75 Cal. App. 447, 454 [243 Pac. 67], the above language was quoted with approval from *People* v. *Muhly,* and the rule there established was followed, and in this case a rehearing was denied by the supreme court. In *People* v. *Tom Woo,* 181 Cal. 315, 328 [184 Pac. 389, 394], where the evidence was circumstantial, the court said: "In our opinion the facts which we have indicated could have been found by the jury are sufficient to sustain the verdict. It is the law that neither mere opportunity to commit a crime, nor perjured testimony is sufficient to support a verdict of guilty. Nor are false statements or suspicious circumstances sufficient. It may be conceded that no one of the facts summarized would, if standing alone, be sufficient to uphold the verdict, but when all the circumstances which the jury may have resolved from the evidence are considered together, it cannot be held on appeal that they are not sufficient to warrant an inference of guilt."

The above language which the court excluded from appellant's instruction No. 3 would have required the jury in effect to consider the various circumstances independently, and to exclude from their consideration the joint effect of a number of concurring circumstances where each one alone could be explained in such a manner as to be consistent with defendant's innocence. This they were not required to do. The remaining language omitted by the court from instruction No. 3 was fully covered by the general instruction given by the court on the subject of reasonable doubt.

Appellant also complains of the refusal of the court to give his instructions Nos. 4, 5, 14, and 21. We have carefully considered these instructions and compared them with the instructions which the court did give, and are satisfied that all the principles of law set forth in the instructions requested by appellant were given in other instructions. The language was not in all cases the same but the subject was fully covered and, of course, appellant was not entitled to have the same principle of law given twice or to insist on his own particular phrasing therefor.

The judgment and order appealed from are reversed and a new trial ordered.

Conrey, P. J., and Houser, J.. concurred.

. A petition by respondent to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on December 22, 1927, and the following opinion then rendered thereon:

THE COURT.—In denying the petition to have this cause heard here, the court is not to be understood as foreclosing the court below on a retrial thereof from again passing upon the admissibility of the testimony offered as to the statement of deceased made shortly after the fatal shot in which he uttered the name ''Carl'' in answer to a question of the witness.