[Crim. No. 3730. In Bank.—October 13, 1934.]

THE PEOPLE, Respondent, v. DAVID LAMSON, Appellant.

Edwin V. McKenzie, Walter H. Linforth, Maurice J. Rankin and E. M. Rea for Appellant.

U. S. Webb, Attorney-General, William F. Cleary, Deputy Attorney-General, Fred L. Thomas, District Attorney, and Allan P. Lindsay and Herbert S. Bridges, Assistant District Attorneys, for Respondent.

PRESTON, J.—The defendant David Lamson stands convicted of murder in the first degree, upon which conviction a judgment imposing the death sentence has been entered. He prosecutes this appeal both from the judgment and from the order denying a new trial.

The case is purely one of circumstantial evidence. The charge is the murder of his wife Allene, alleged to have occurred in their home on the Stanford University campus at Palo Alto, Santa Clara County, California, on the morning of May 30, 1933. This young couple had been married about four years and there had been born to them a daughter, then some two or three years of age. This small daughter was absent on the day in question, being away on a visit with the mother of defendant. The defendant had also residing in the vicinity, besides his mother, two sisters, one of whom, Dr. Margaret Lamson, is a practicing physician.

Defendant and his wife were both connected with the activities upon the university campus, she as secretary of the Y. W. C. A. and he as manager of the Stanford University Press, which published mainly scientific books. He also had some slight experience as an amateur actor. The couple moved in the best social circles and were well known to a great many people prominent in the university campus life. Numerous friends, intimately acquainted with both of them, came forward to testify to the cordial and apparently affectionate relationship between them, emphasizing especially defendant's uniform kindness toward and consideration of his wife.

She was found dead by the defendant himself about 10 A. M. of said day, her body being in the bathroom. The exact location of the body when death occurred is unknown except to the defendant, for admittedly, after discovery, it was disturbed by him on at least two occasions between the announcement of her death by him and the viewing of it by others. This circumstance, among others, makes it difficult indeed to solve the mystery surrounding the death. We must, therefore, detail the defendant's statement of events in order to bring to the surface the question of law we must determine.

Defendant stated that he and his wife returned from a social visit with Dr. and Mrs. Wright in Palo Alto about 11 o'clock of the evening of May 29th; that his wife had eaten some lemon pie and orange juice and, as a result thereof, was suffering the distress of indigestion; that she retired, however, about 11:40 P. M.; that at the home of the Wrights he had previously announced his intention of spending a part of the coming holiday working in the yard; that owing to the indisposition of his wife and the absence of their child, he elected, as he had sometimes done before, to sleep in the back bedroom and not in the room with his wife; that he removed his working clothes from their usual place in the hall closet, and put them in the living room where he would have access to them early in the morning without disturbing his wife, who was what is known as a "light sleeper"; that he also procured at the same place his bathrobe, pajamas and slippers; that he read a while before retiring, waiting to see that the light in his wife's room was extinguished by her, that he then went to the bathroom and undressed therein for bed, hanging his clothes upon a hook on the inside of the bathroom door. The position of these clothes will be hereafter referred to.

He stated that about 3:30 A. M. his wife called to him and he attended her at that time, rubbing her back for several minutes and procuring some lemon juice and water for her, which was followed by a bowl of soup and sandwich, both held over from a previous meal; that his wife's condition settled and in about three-quarters of an hour he returned to bed; that rather early in the morning he arose and dressed for work, leaving his bathrobe, pajamas and

slippers in the living room; that he prepared his own breakfast and after leisurely moving around for a while, went to work in the back yard about 7 A. M. He detailed in a plausible manner the kind of work which he was doing about the yard. He stated that, among other things, about 8 A. M. he built a fire to burn accumulated rubbish; that he saw and talked to several neighbors during this period; that about 9 A. M. he returned to the kitchen, prepared a few things for his wife's breakfast, drank another cup of coffee himself, and then drew water for a bath for his wife; that he then went to her room and assisted her in getting up; that she went to the mirror and braided her hair in two braids and that he thereafter accompanied her to the bathroom and gave her his hand to assist her in stepping into the tub; that he then returned to his work, leaving the water boiling for his wife to make a Postum drink following her bath; that he then set the sprinkler in the front yard and went to the back yard and pursued the work he had theretofore begun; that around 9:50 A. M. Mrs. Place, a real estate broker, appeared at the front door with prospective lessees for the Lamson home by the name of Mr. and Mrs. Raas; that, failing to get admittance at the front door and seeing the sprinkler and hearing voices in the back yard, Mrs. Place came upon defendant there talking to a neighbor, Miss Vincent; that on learning the mission of Mrs. Place, he told her to return to the front door; that he would go to the back door, pick up some things, and admit her and her clients at the front door; that at this time he was stripped to his waist and wore gauntlets; that he immediately put on one of the two shirts he had hung on the lattice fence, removed his working boots and put on tennis shoes; that, carrying his gauntlets, he then entered the house gathered up the bathrobe, pajamas and slippers and perhaps some other clothing, and proceeded toward the hall closet near his wife's bedroom; that in so doing it was necessary for him to pass and he did pass the bathroom door and there saw evidences of blood which immediately led to the discovery of his wife's body.

At this point the further testimony, other than that of defendant, was without dispute that it was from three to five minutes after Mrs. Place left defendant in the back yard before he re-appeared at the front door; that prior

to his appearance at the front door she heard cries of grief and a little later defendant opened the front door, appearing with blood on his shirt, face and hands, and exclaimed: "My God, my wife has been murdered"; that a few minutes later he said: "Get the police to find the murderer", and a little later: "Who could have done it? No one had anything against her."

Mrs. Place immediately began calling doctors, officers and an undertaker, by telephone. Mrs. Raas summoned neighbors. Several responded, among them Miss Vincent and Mrs. Brown. Later the undertaker arrived, and a little later Dr. Saier; about 10:10 Chief of Police Zink of Palo Alto and Officer Gilkey, and still later Officer Lawrence, who some time during the forenoon took pictures of the then condition of the bathroom and objects in it. The sheriff and his deputies arrived about 10:50 A. M.

Before any officer arrived defendant was known to have handled the body of his wife at least twice, taking it into his arms and purporting to exhibit genuine grief. Before Mrs. Place was admitted, it is evident that defendant had handled the body of his wife and the blood on his clothing resulted therefrom. After Mrs. Place was admitted, he returned to the bathroom and again had the body in his arms. All this occurred before the arrival of any of the officers. When Mrs. Brown arrived, defendant was still in the bathroom, with the body in his arms, calling upon his wife to speak to him and showing further outward evidences of deep-seated and demonstrative grief. Mrs. Brown led him out of the bathroom into the maid's room where he collapsed, and later, having recovered composure, he was induced to change his clothing again, as what he had on was then quite wet and bloody.

The injuries received by Mrs. Lamson may be described as four lacerations on the back of the head, covering the occipital protuberance and surrounding area. Three of said lacerations were somewhat horizontal in direction, two, however, being somewhat curved. The upper was 4½ to 5 inches long, the middle 2½ inches and the lower 1½. The fourth was an irregular perpendicular, 3½ inches long, extending from about ½ inch above the upper laceration and across it, forming the end of the second and also the end of the third, meeting the latter at an angle of

about 30 or 45 degrees, and extending across it. There was, as a part of said lacerations, one depressed fracture of the skull as well as an undepressed stellate fracture thereof. There was brain injury under the depressed fracture as well as *contra* coup injuries to the frontal brain; also a slight hemorrhage over the entire surface thereof. To this should be added the presence of three small hemorrhage areas between the layers of tissue composing the scalp. Lastly, no other abrasions of the skin were found but there were three bruises, which may be material, and which are described as two spots over the anterior portion of the hip bones at the two prominent points, the left being slightly larger than the right and the areas approximately 1¼ inches in diameter. There was on the left leg, about two-thirds of the distance from the knee and one-third from the ankle, on the outer surface, a similar area showing bruise, the skin not being broken, approximately 1 to 1¼ inches in diameter.

Knowledge of the cause or causes which produced these injuries would furnish the solution of the problem before us, to wit: Did the decedent meet her death by a criminal agency or was her death produced by accidental means?

Resting its case upon circumstantial evidence, the prosecution must not only show a set of circumstances consistent with guilt, but must show a set of circumstances inconsistent with any reasonable theory of innocence. This test the prosecution asserts it has met. But the defendant asserts that the evidence in the record is not only consistent with death by accidental means but preponderates in favor of that conclusion. Consideration of these contentions requires a further elucidation of facts:

To our mind the conclusion is unescapable that the decedent met her death in the bathroom; that she met her death after she had stripped to enter the tub; moreover, that death occurred after she had gotten into the tub and with the bathroom door practically closed. We should first state that at 10:10 A. M. both the water in the tub and the body of the deceased were still warm. *Rigor mortis* was not then discernible as the physician was able to manipulate the head in ascertaining that life was extinct. This strongly corroborates the defendant as to the period of time within which the deceased must have died and has a distinct ten-

dency to overthrow the state's theory that she died prior to 8:45 A. M. We are pointed to no other evidence indicating the probable hour of death.

The conditions in the bathroom now require consideration: The position of the body at the time of death is unknown, as already noted, except to the defendant, who testified that he found the body draped over the bathtub at the hips, facing downward, about half in and half out of the tub, he thought near the center of the tub but was not positive and could not say whether or not the head touched the floor. So all we have are the other surrounding physical circumstances. Said statement, however, accounts for the bruises on the hip bones.

The bathroom is a diminutive one, being but 7 feet 10 inches long, the ceiling 8 feet, 4 inches high. The door, entering from the hall, is at the north end, 30 inches wide. The entire length of the west side of the room is occupied first by a linen closet to the north near the door into the hall, and the remainder by the bathtub. The longest side is against the .west wall. The remainder of the room, after taking out the space for the closet and bathtub, is but 48 inches wide, partly occupied by a washbasin stand and toilet. The tub itself is 30 inches wide and 18 inches high. From tub to basin is 29⅛ inches; from basin to hall door 35 inches. The rim of the basin is 29½ inches above the floor. The basin is opposite the tub, north of its center, at about the quarter-length point. The rim of the tub is 11¾ inches lower than the top of the basin. The linen closet also has a door about 30 inches wide and both this door and the bathroom door swing inside the bathroom. A metal clothes hamper 23½ inches high stood at the east wall between the basin and the door. There was a metal waste basket immediately under the washbasin. There was also a two-step ladder at the south end of the bathroom.

The deceased was 5 feet 6 inches and weighed 115 pounds. Defendant, as already noted, had disturbed the body several times but stated he left it in somewhat the same way in which he found it, although its location on the side of the tub was uncertain. Decedent's hair had been braided but when seen the right braid was down. Many people were in and out of the bathroom during the day, and before any

pictures were taken, but the condition as disclosed when the pictures were made at about 11 A. M. was as follows:

A bath towel and bath mat were lying crumpled on the floor, saturated with blood. The nightgown was hanging immediately over the north end of the bathtub, its bottom being within a foot of the edge of the tub. Near the bottom of the garment were 14 arterial blood spots and some other stains, indicating splotches of blood and water mixed, called in the record hemolyzed blood. The two-step ladder at the south end of the tub was without blood stains. There were blood stains upon the bowl of the toilet. A woman's sheep or fleece-lined slippers were placed in an orderly manner along the east wall south of the basin and near the toilet. The right slipper had blood without and many small spots within it. There were eight small spots on the inside over the arch of the slipper. Fresh arterial blood was also found inside the left slipper. A lady's watch was on the shelf over the washbasin. The metal waste basket under the basin had many arterial spots of blood on its surface facing the tub and also some inside facing the tub. On the inside of the bathroom door a coat, vest, soft white shirt and pair of white flannel trousers were hanging, the latter being so hung that the waist line and belt were at the same level as the lower part of the legs. Both the trousers and shirt showed arterial blood spots as did also the coat. The coat even had spots inside one sleeve for a distance of almost six inches. The metal hamper had a ventilator open and also a lid partly open. Arterial blood was found upon the clothes within it and there were also arterial blood spots on the outside above the ventilator. The bathtub was partly filled with water, still warm at 10:10 A. M., as already noted; on the side of the tub were streaks of blood and water where the body was then located, and the same to the south thereof.

It has already been noted that the lacerations, fractures and contusions existed on the back of the head of the deceased at the occipital protuberance. We have also noted elsewhere the three bruises, one on each hip-bone anterior and one on the left leg, halfway between ankle and knee. Further blood conditions remain to be described: Arterial blood, coagulated, was in great quantities on the floor at the north end of the room. Hemolyzed blood was also

found on the floor. Arterial blood to a great extent was on the east wall north of the washbasin and on the inside of the bathroom door; also on the closet door to the left; also underneath the washbasin and at various other places.

Now, compare these conditions with the story related by the defendant and where can be found facts consistent with guilt and inconsistent with every other hypothesis? Without waiting to examine the question of whether or not the *corpus delicti* has been proved as a matter of law, let us examine a few of the state's contentions in connection with this matter.

First, it is contended by it that if it be assumed that the deceased fell while standing in the bathtub and hit her head against the rim of the washbasin, then, instead of falling partly in and partly out of the tub, her entire body would have been found on the floor. Defendant offered to demonstrate, for practical purposes, that this contention is unsound but was denied that privilege upon the ground that it was a question of common knowledge and not one of expert testimony; moreover, that the demonstration could not be made successfully unless the experimentee died in the process. We are thus left to our own common judgment. Who can say with any assurance that when the feet slip out from a woman 5 feet 6 inches tall, standing in a bathtub, and she falls against a solid substance, producing unconsciousness, the body thus becoming the hypotenuse of a right triangle, with base about 40 inches and altitude 29½ inches, that the center of gravity would not be below the rim of the tub 18 inches high and some 30 inches from the point of impact? The state does not reckon with the factor that a foot or more might be available in the tub for the feet to slip, thus bringing the center of the body clearly within the rim of the tub. It could more plausibly be argued that the entire body might go into the tub instead of only the lower extremities.

In this connection respondent further contends that bruises should be found on the face of the deceased because the face must have struck the tiled floor of the bathroom. This argument seems no sounder than the first and may be answered the same way.

It is next contended that the body was washed by someone. This contention is founded upon the assumption that there

was no blood clot upon the wounds in the head and that the upper extremities of the deceased were practically free from blood. Upon this is built the argument that the deceased was transported into the tub from some other place for the purpose of washing the body. What motive would have prompted such conduct is not stated. Moreover, the contention does not appear to have a sound basis. No one, in view of the physical condition of the bathroom, would hesitate to declare that the decedent met her death therein and not elsewhere. It should be again remembered that the defendant handled the body, after discovery, a number of times. Besides this, there were clots of blood in the bathtub which could not have come from any other source than the wounded head. Defendant testified that in handling the body, it slipped from his arms and was practically submerged in the water in the tub. Later he had the body in his arms again and many times was in and out of the bathroom after the discovery. Besides, fresh blood was found in the ear, splotches on the arms, in the hair and perhaps elsewhere. Said theory of the state is simply too conjectural, standing alone, to be a solid link in a chain of circumstantial evidence.

It is next asserted that there was an attempt by someone to clean the bathroom. From what has already been here set forth, it is evident that this would have been a herculean task. The contention has no substantial basis. It rests solely upon the conjecture that the bath mat was used as a mop. The point need be but mentioned to show that it cannot be made a link in the chain of circumstantial evidence.

Entitled to no more consideration is the contention that an attempt was made to clean up the hallway. There were splotches of blood outside the door and on the walls of the hallway and one spot on the trap door in the ceiling. When they were made no one knows. With blood on the floor and on the clothing of the defendant found in the hall, and placed there after discovery of the body, with people tracking in and out of the bathroom, and the spreading of papers and sheets on the floor, it is no wonder that spots of washed blood were found in various isolated places. This is a sufficient reply to the argument that someone attempted to wash off blood spots from defendant's pajamas

and bathrobe. Some of these garments, he says, were thrown on the floor near the bathroom when he discovered the body and blood could hardly have failed to reach and make spots on them. As for the nightgown of the deceased, a splash of the bloody water from the tub could account for all the washed blood spots on it and the arterial blood spots show that it was hanging at the point stated at the time the deceased was bleeding.

Much is made by the state of alleged contradictory statements of the defendant. They consist chiefly of this: That the chief of police and one or two other officers said defendant claimed he was returning from depositing his bathrobe and pajamas when he discovered the body, whereas, on the trial he stated he was going to put them away when he made the discovery. The fact is that the latter statement must be true, if either is, for the clothes were first on the floor and then taken to the bedroom; indeed, the gauntlets and one of defendant's slippers were actually in the bathroom itself. Again, Officer Davis corroborated the story of the defendant as to when he discovered the body.

It is next asserted that defendant killed his wife with an iron pipe less than 10 inches in length and ¾ of an inch in diameter. One witness testified that within the rusty threads of this little pipe, which was found in the ashes of the bonfire in the back yard, was evidence of the presence of blood. He does not state that it was human blood, nor could he. Another expert produced by defendant, who worked with the other one, would not confirm this fact. In all probability the contention is pure conjecture. In the first place, the iron pipe was in the fire for hours and little, if anything, could be told about the kind of blood, if any, on it; furthermore, it was in the fire before 8:45, when the witness smelled some peculiar odor coming therefrom. It is entirely reasonable to suppose that Mrs. Lamson was still alive at that time. *Rigor mortis* had not set in at 10:10 A. M. Nothing of value developed out of the odor detected by the witness, which may have been only paint. The contention that such pipe could have produced the injuries from which Mrs. Lamson died is extremely doubtful and brings to the surface the last major contention of the state, to wit: That the wounds on the head of

Mrs. Lamson were such that they could only have been caused by four or more blows of this or a similar pipe and could not have been produced by accidental means.

The injuries may be more particularly described as follows: Draw a line across the back of the head from a point just below the top of the ear to a corresponding point on the other ear; exclude from either extremity of this line about 1½ inches and you have a laceration somewhat curved upward, 4½ to 5 inches long. This is the upper laceration on the head of the deceased and may be designated by the letter A. From a point about one inch to the right of the center of said line A, an irregular perpendicular laceration is encountered, which may be designated as "D". Laceration D is 3½ inches long, starting from a point ½ inch above A and extending downward, forming the ends of or extremities of two other horizontal lacerations, designated "B" and "C", which are to the right of it, and further extending slightly below C. Laceration B is 2½ inches long; C is 1½ inches long. In the area along D and for some 2 inches along the central part of A, and all the greater part of the lengths of B and C, was a contused or macerated area. A depressed fracture lay under the junction of lacerations B and D to a depth of 1/16th of an inch, consisting of loose or detached skull. In other words, A was contused in the center and not on the ends. B was badly contused throughout and along practically its whole length. C was somewhat less contused. D was badly contused in the region of B.

The deceased also had, in addition to the above, a compound comminuted fracture of the occipital region of the skull, a contusion of the left cerebellum, under the depressed fracture; a hemorrhage in the right cerebellum; a hemorrhage in the left frontal region of the brain and a contusion in the right temporal region. The other bruises over the anterior hip-bones have already been described above.

Can these injuries be explained upon any reasonable hypothesis of accident? We have shown that every other claim made by the state is easily explained on a theory consistent with the innocence of the defendant. We approach this last question with admissions of the prosecution. First, it is admitted that it would take four or more blows from the iron pipe to produce such injuries. This means that

three or more horizontal strokes of almost equal force and a perpendicular one, of equal or greater force than the rest, would be required. It is certainly next to impossible to appreciate that any such amount of force could have been so uniformly applied or that a perpendicular stroke could have been the exact extremity for two other horizontal strokes. If either would produce unconsciousness and death, in what way could the body have been held to have repeated the uniform blows? And in what position could the body have been to receive with even greater force a blow struck in perpendicular fashion? The very contemplation of this most unusual situation causes the mind to halt and falter.

Again, the experts for the prosecution all admitted that the brain injuries could have been wrought by a single blow. Defendant asserts with plausibility that the frontal *contra* coup brain injuries could have been caused only by a single blow and that a blow caused by the head striking some non-resistible object and not by a swinging blow. To this contention respondent offers no reply. The prosecution also admits that a single blow could have produced the compound comminuted fractures of the skull. As we understand this admission, if all the lacerations were absent except one, the fractures and brain injuries could have been produced. If this be true, what effect would subsequent blows have produced? If the brain injuries and fractures could have been produced by one blow, and that a fall, does this not suggest that one blow may have caused them all, fractures and lacerations included?

The prosecution, we understand, further concedes that a fall or one blow could have produced the four lacerations and attending results if the force was applied at the four places at the same time. Much testimony was received, and considerable excluded, all having for its purpose showing that a blow upon the washbasin, or even a flat surface, could have produced all these injuries as found on the head of the deceased. This testimony accords with our mind to the extent that such an explanation is not so unreasonable as to be rejected altogether. In fact, ascribing these injuries to the wielding of the pipe produced, seems much more improbable to us than that they occurred as the result of a fall. The macerated areas of these lacera-

tions form a distinct pattern. Each in reality may be considered a part of the other. This area of some 2 to 2½ inches embraces the occipital protuberance, the median line and some well-defined ridges on the skull. The lacerations are really flaps around the vertical one as a stem. How could an iron be wielded with such precision as to force, as to length of contact and as to location? Which is the first stroke, the second and the third and fourth? And in what position was the victim when they were dealt? What was the effect of each? If the first produced the brain injuries and the undepressed fractures, what was the effect of the others? The mind can easily conclude that they were, as defendant's experts determined, the result of one blow producing what is called an "explosion" fracture.

The three small areas of hemorrhage at the roots of the hair should be mentioned. Only one expert found them. One was connected with the lacerations direct and the other two were near or under the hair braids and apparently not immediately connected with the wounds. Whether they resulted from the fall or from being caught as the body fell after the blow, or whether someone pulled the hair can never be determined. At full worth, they represent no more than a suspicion or conjecture and cannot alone rise to the dignity of establishing death by criminal means.

The prosecution dwells but little upon the question of motive, which consisted of an alleged tryst with a Sacramento woman and of a statement to a friend, overheard by an officer, to the effect: "Why did I ever marry her?" This was all plausibly explained consistent with innocence and, moreover, is of no value where the *corpus delicti* is not proved.

Finally, the position of the main pool of blood in the bathroom is explained consistently with the story of defendant when the dip or unevenness of the floor is considered.

Contemplating this case as a whole, the mind is not satisfied that the rule controlling in circumstantial evidence cases has been met as a matter of law. This rule is elementary and is aptly restated in the case of *People* v. *Staples*, 149 Cal. 405, 425, 426 [86 Pac. 886, 894], as follows: "It will be perceived that the evidence in the case relied on to establish the guilt of the defendant is practically

circumstantial, and it is elementary law that where the evidence is of such a character it must be not only consistent with the hypothesis of guilt, but inconsistent with any other rational hypothesis. The deduction to be drawn from these circumstances is ordinarily one for the jury, but where, in a case such as this, every circumstance relied on as incriminating is equally compatible with innocence, there is a failure of proof necessary to sustain a conviction, and the question presented is one of law for the court. The prosecution has the burden of proof. The defendant is presumed innocent until the proof satisfies the jury beyond a reasonable doubt of his guilt. The right of a jury to return a verdict of guilty is not an arbitrary right. The sufficiency of their verdict must be tested by determining whether the evidence upon which that verdict is framed was of such a character that they could say from it that in their judgment no reasonable doubt of the defendant's guilt existed.''

Where in the case before us is there evidence of a preparation for commission of a crime? Where is the plan by which the death was to become known? Where is the effort to prevent detection or for concealment? Where are the bloody or missing clothes? Where is evidence of a seizure in order to inflict the blows? Every statement of the defendant, capable of verification, tends to support his claims. It is true that he may be guilty, but the evidence thereof is no stronger than mere suspicion. It is better that a guilty man escape than to condemn to death one who may be innocent. These views render it inadvisable to prolong this discussion by consideration of the various other assignments of error.

The judgment and order denying a new trial are, and each is, reversed and the cause remanded for a new trial.

Sturtevant, J., *pro tem.*, concurred.

SHENK, J., Concurring.—I concur in the reversal of the judgment but not for the reasons stated in the foregoing opinion. From the evidence received in the case I am satisfied that there was sufficient upon which to base the conclusion that the deceased did not come to her death by accident and that the *corpus delicti* was established.

However, the defendant desired fully to rebut this showing. I am convinced that the trial court unduly restricted the defendant in his offer of proof of an experiment by which he proposed to show that when a woman of the size of the deceased was placed with her head upon the washbasin and her feet in the bathtub in said bathroom, and was allowed to slip from that position, she would always slip back into the bathtub. While ordinarily the trial court may in its discretion admit or reject testimony concerning experiments, I am satisfied that the refusal to admit such testimony constituted an abuse of discretion under the circumstances presented by the evidence in this case.

I think the trial court also erred prejudicially in unduly restricting the defendant as to the tendered expert testimony on the question whether the fatal injuries could have occurred by coming in contact with the washbasin.

Furthermore, the question of the position or positions of the body of the deceased at the time that the blood spurted therefrom and onto the walls was of utmost importance. The defendant offered expert testimony to prove, from the location and shape of the spots of blood, that said blood spurted from the wounds while the body was in a position consistent with the defendant's claim of accidental death by a fall against the washbasin. I believe the trial court also committed prejudicial error in excluding such testimony.

There are other assignments of error, including the claim that the defendant was prevented from having a fair and impartial trial by reason of the fact that a deputy sheriff of the county served as a member of the trial jury. As to certain of said assignments, it does not appear that there is any substantial merit therein. As to the remaining assignments, including the alleged disqualification of the juror, I believe it unnecessary to discuss the same as there is no likelihood that the questions involved will arise on a retrial of the cause.

Spence, J., *pro tem.*, and Waste, C. J., concurred.

SEAWELL, J., Concurring.—Whether or not the deceased met her death by accident or whether it was the result of a criminal agency presents a very close question of law.

The jury, by its verdict, found that the evidence proved the defendant guilty beyond a reasonable doubt and to a moral certainty, and that there was no reasonable theory or hypothesis upon which he could be innocent. The evidence is largely circumstantial and conflicting to the extent on the one hand that the cranial injuries which caused death could have been produced by an accidental fall, the back of the head striking against the rim of the washbasin, and on the other, to the effect that the cranial injuries could not have been inflicted by one impact but that they were the probable result of several blows. There is no satisfactory evidence of motive on the part of defendant and but slight, if any, incriminatory evidence which tends to support a wicked design to take life. Upon the nature and character of the wounds the inference of guilty or not guilty must flow. I am not prepared to say, as a matter of law, in the face of two opposing conflicting theories, neither of which is demonstrable to the degree of certainty, which the law requires, that the judgment of death should be executed. I am also partially brought to this view by reason of the fact that a member of the sheriff's official family served as a juror in the case. I impute no corrupt motive to said juror as it is most unlikely that he was conscious of the effect of the relation which he bore to the sheriff of the county. It is true that he was called a courtesy deputy, which means that he received no salary, and has, perhaps, no fixed duties to perform, but nevertheless, he was a deputy sheriff and may have felt that he owed some fealty to his principal. Had he been interrogated as to his relationship to the sheriff, he doubtless would have frankly revealed it and the defense, very likely, would have exercised its right of challenge. The sheriff was very active, as he should have been, in his duty to establish the cause of death which had occurred under unusual circumstances and in so doing he became convinced that there was probable cause to believe the defendant had committed a homicide. In fact, he swore to the complaint accusing defendant of murder. While no one can be said to be censurable for a seeming fortuitous event, nevertheless the defendant was deprived of the right of having his case presented to twelve qualified jurors in a case in which the crime is punishable with death and no valid judgment can be pronounced in

capital cases upon a verdict unless said jury is constituted of twelve legally qualified jurors. The power to execute judgments in criminal cases has its sole origin in a verdict of a jury composed of twelve jurors formed in the manner provided by law. The reasoning upon which I am impelled to hold said juror disqualified is set forth in *People* v. *Le Doux*, 155 Cal. 535 [102 Pac. 517]. I am not of the view that the trial court committed prejudicial error in its rulings excluding or limiting proffered evidence of an experimental character, or that the defendant suffered prejudice by the court's ruling on the admission of evidence upon any other question presented or that the instructions were erroneous as to any substantial proposition of law.

For the reasons above assigned I join in the order of reversal.

LANGDON, J., Concurring.—I concur in the judgment of reversal, on the same ground stated in my dissent in *People* v. *Tedesco*, 221 Cal. 211 [34 Pac. (2d) 467], filed July 2, 1934. The two cases present the same question on appeal, namely, the sufficiency of the circumstantial evidence introduced therein to sustain the judgment of conviction. In the instant case, in my opinion, the record does not conclusively establish either the guilt or the innocence of the defendant; but the law requires that the defendant's guilt be proved beyond a reasonable doubt, and the state has failed to meet the burden thus placed upon it, notwithstanding the fact that the record shows there was no lack of painstaking and intelligent effort put forth by both the sheriff and the district attorney to do so.

I am unable to agree with the conclusion reached in the concurring opinion, that reversible error was committed in the trial of the case. In my opinion, the alleged errors in admission and rejection of evidence, and the other claimed irregularities, did not, taken separately or together, so prejudice the defendant as to amount to reversible error.