[Crim. No. 680.   Fourth Dist.   July 7, 1950.]

THE PEOPLE, Respondent, v. LILLIAN GERTRUDE SOLLOWAY, Appellant.

Taylor F. Peterson and Thomas C. Parry for Appellant.

Fred N. Howser, Attorney General, and Frank Richards, Deputy Attorney General, for Respondent.

BARNARD, P. J.—The defendant was charged with the murder of her husband and a jury found her guilty, in the second degree. She appeals from the judgment and from an order denying her motion for a new trial.

The deceased was killed on September 9, 1948, at or near a house in Crestline where the defendant and their three small children were living. He was in the liquor business in San Pedro, coming home at weekends or occasionally. He came on September 8 and that night went to a show with his wife, leaving two children with a Mrs. Walls. About 10:30 the next morning, Mrs. Walls called at the home and saw them all. The defendant and her husband were trying a test given in the Reader's Digest. When she left about 11, the deceased said he intended to leave for San Pedro as soon as possible. He appeared at Mr. Walls' service station about 11:45. After Mr. Walls repaired a flat tire for him he said he was leaving immediately for San Pedro.

About 1:20 or 1:30 that afternoon Mrs. Walls saw the defendant near her home in the deceased's car, with her oldest boy. The defendant told her that "Daddy" had left the house with two "characters" and she was worried about him. She always called her husband "Daddy." About 2:30 Mrs. Walls saw her at the same place and the two took some children to a theater and returned to the defendant's home. Later, Mrs. Walls took two of the children in deceased's car, to get their hair cut, and returned to defendant's home with all of the children. She did not see the deceased that afternoon. About 5 o'clock she and the defendant, with all the children, went uptown to get some "frosties" and then parted. About 7:30 that evening she again saw the defendant and the children waiting at the skating rink.

About 11:45 that night the defendant appeared at a neighbor's house about 60 feet from her home, and asked the neighbor to call the police. She was badly excited and frightened and he had difficulty in ascertaining the reason. He was unable to get the sheriff's office on the phone and, leaving his wife to continue the attempt, went back with the defendant. As they walked up the driveway she screamed, and shifting his flashlight he saw the body. They returned to his home

and he drove to the village to find an officer. The defendant remained and told his wife that her husband had left about 1:30 with a peculiar looking couple, that they were out to get her and the children, and that she was worried.

A constable and another officer, sent by the neighbor, arrived shortly after midnight. The constable saw the deceased lying face down near the side of the driveway. There was some blood on the ground near his head, and some leaves in his hair. He rolled him over and saw that he was dead. Underneath his body was a .22 caliber automatic pistol which was jammed, with a live round in its firing chamber and another against it. The defendant had purchased this gun and a box of cartridges on September 1, 1948. After the body was later turned face down a much larger amount of blood appeared on the ground.

A deputy sheriff and another officer arrived a few minutes later and questioned the defendant. Three other officers arrived about 3:30 a. m. and again questioned her. About 5 a. m., and about 8 a. m. two of these officers and a deputy district attorney again questioned her. While her story remained the same and was not impeached, on essentials, it contained a few elements the explanation of which was not too satisfactory. She said she did not know whether her husband had any insurance ''or whether we have got anything or not.'' She stated that her husband left the house at 1:30 p. m. to practice shooting; that as he walked down the driveway with this gun in his hand a car drove up and someone hailed him; that he told her he would be back in a few minutes and got in the car and they drove off; that they were rough looking characters, a man and a woman; that about 2 o'clock she took the children to a show, leaving a note telling her husband where she had gone; that when she finally returned about 6 p. m. her husband was not there; that after giving the children their dinner she took them to the skating rink but found it closed; that she purchased ice cream rolls for the children and returned home about 9 o'clock; that after putting the children to bed she washed some clothes and then locked the cellar door about 10 o'clock; that she went to bed and read a magazine, and the radio was playing; that she fell asleep and was awakened about 10:30; that she then heard a commotion in the driveway, with loud voices and much profanity; that she was nervous and frightened and did not get up; that she lay in bed until she heard a car leave; that she then got up and went to the neighbor's; and that while returning with the neighbor they found the body. She also said she had bought

this gun to take along on a proposed vacation and for protection.

The house was on the side of a hill, with a basement underneath. Across the bottom of the doorway to this basement was a concrete slab a foot high, from the middle of which the sharp end of a screw stuck up three-fourths of an inch. About 15 feet away was a steep bank, 4 or 5 feet high, with the driveway below. The prosecution theory was, and is, that the defendant shot her husband in this basement about 1 o'clock, and that shortly before midnight she dragged his body over this sill and on down the bank and driveway. No cloth threads or foreign matter were found on this screw.

The officers found a number of blood spots in the basement. There was a small one on the slab and others on an old picture frame, or some small pieces of wood, on a garden hose, and on the floor. The defendant had two dogs, a fox terrier and a cocker spaniel, which had constant access to this basement. Some of the blood spots were shown to have come from one of these dogs, and the evidence is conflicting as to whether others were human blood. The eyeglasses worn by the deceased were found between the basement door and the bank, with blood spots on them, and some red stains on the ferns and shrubs near by. An area near the basement door appeared to have been swept. The deceased's car was in the driveway below the bank, backed up against the garage door. Another small area between this car and the bank appeared "as though a burlap sack had whipped it around and disturbed the ground." Underneath the car there were two parallel marks which appeared to be cut off by the tracks of the car, and also two tracks of a bare foot. The area between the car and the body had not been swept and there were no marks on it. There was a disturbed area of about 2 feet on the slope of the bank. There was a red stain, looking like blood, on a rock which appeared to have been dislodged from the bank.

A large number of articles of clothing was found on the back porch. Most of these were dry, but some in a stationary tub were wet and had a strong odor of chlorox or purex. The defendant explained that she had to use purex as clothes became very dirty in the mountains. A pair of shoes, which had been worn by the defendant on September 9, had been washed and had a strong odor of purex or chlorox. There was a spot of blood on one which the prosecution expert said had

been dry before the shoes were washed. An old stain, which may have been blood, was found on a dress worn by the defendant on that day. There were some scratches on the rear of deceased's shoes, and his heels could have made the parallel marks beneath the car. His shirt had a tear back of the left shoulder. While there was some dirt on him, his body and clothes showed surprisingly little evidence of having been dragged over this screw and down the bank and driveway.

Death was caused by a bullet which entered below and behind the left ear and emerged at a point in front of and above the tip of the right ear. There were powder burns around the point of entrance. There were other marks on the body. His right eye was black and ''somewhat swollen,'' and he had bruises on his nose and eyebrows. There were several marks on his left shoulder about an inch in diameter. There is no evidence as to whether the body was warm or cold when found, or whether it was limp or rigid. There is evidence that an empty shell, also found in the basement, had been fired from this gun at some undisclosed time. There is evidence that the bullet wound might have been made by a .22 caliber bullet, or might well have resulted from a larger steel-nosed bullet.

The appellant first contends that the evidence is not sufficient to prove, beyond a reasonable doubt, that she killed her husband. The respondent contends that it was clearly established that the deceased was shot and killed in the basement and that his body was later dragged to where it was found; that he was killed about noon since he then left the service station intending to go to San Pedro, was not in his car with the defendant at 1:30, and was not again seen although Mrs. Walls visited the house twice that afternoon; and that the defendant was the killer since he was killed with her gun and since her story, that he took the gun for target practice and then left with two rough ''characters,'' is unbelievable.

The theory that the shooting and death occurred in the basement and that the body was thus dragged to the driveway, while possible, is not entirely convincing. The evidence is conflicting as to whether some of the blood found in the basement was human blood. While there were some marks and footprints under the car, and small areas appeared to have been swept or brushed, there were no signs of dragging on the larger area which had not been swept. No bullet was found in the basement or its walls. With children around that would be a natural place to find an empty shell. The fact that a

larger amount of blood ran out after the body had been twice turned over is rather inconsistent with the theory advanced. The condition of the body and clothes were at least unusual, if such a dragging had occurred. It would seem more probable that a fight took place in the area where the glasses were found, which was followed by the shooting.

As to the time of death, the physician who performed the autopsy at 8:30 the following morning testified that only a moderate amount of *rigor mortis* appeared, that death had occurred between eight and twelve hours prior to that time, and that there was no post-mortem lividity. He testified that lividity is a discoloration which appears where a body remains over four hours in one position, and that after lividity once forms it remains in the same place when the body is turned over. The evidence is not sufficient to establish, beyond a reasonable doubt, that the killing occurred about 1 o'clock that day. The preponderant, if not the conclusive, evidence is to the contrary. This time element was, and is, strongly relied on by the respondent as showing opportunity, and because the deceased was not seen after that time.

The facts relied on as disclosing the identity of the killer are far from satisfactory, especially in view of the theory on which a conviction was obtained and is here supported. The defendant's statement, that the deceased left the house with the gun and then drove away with two people, is neither inherently unbelievable nor necessarily disproved by the fact that he had previously expressed an intention to leave at once for San Pedro. It was shown that he had recently been engaged in a violent encounter in San Pedro, in which a deadly weapon was used. While the defendant had purchased the gun found under the body, it was not shown to have been recently fired or, with any certainty, that the fatal bullet came from it. If the defendant shot her husband with this gun no good reason appears why it later became jammed. This matter is entirely unexplained unless he had attempted to use it in defending himself. The bruises on his face, which the autopsy surgeon said could have been caused by fist blows, would also indicate a fight before the shot was fired. There were no marks of such a struggle on the defendant. There was no evidence of any ill feeling between them, they had gone to a show the night before, and they were playing a friendly game when Mrs. Walls saw them that morning. The defendant displayed no nervousness when she took the children to a picture

show about 1:30, or during the afternoon when Mrs. Walls saw much of her, but she was badly frightened when she ran for help that night.

Moreover, the effect of the testimony of two doctors is that she could not have lifted and dragged this body in the manner contended. Her own doctor testified that he removed her appendix on August 17, 1948, and that it burst during the operation; that he took out the stitches on August 31; and that he then told her not to do any lifting for three months. He further testified that, knowing her condition, he believed she would have suffered serious damage if she had lifted or dragged a body of this size for some 35 or 40 feet. Another doctor who examined the defendant during the week of September 13, 1948, testified that he looked for but found no bad results from the operation caused by exertion. Aside from any physical impossibility, it hardly seems reasonable that she would dare to go away for most of the afternoon and evening, leaving the body in an open basement. While the doctor who performed the autopsy testified that he then believed that the deceased could not have shot himself, he had testified at the inquest and preliminary hearing that the bullet wound could have been self-inflicted. It cannot be said that the evidence discloses, beyond a reasonable doubt, that the fatal shot was fired by the defendant.

The evidence as to motive is also unsatisfactory. While proof of motive is not essential (*People* v. *Greig*, 14 Cal.2d 548 [95 P.2d 936]) it is important in considering the effect of other evidence. There is much evidence about some debts owed by the defendant and which she had promised to pay soon. She had borrowed money from two of her friends, one of whom testified that she said she wanted it for investment, asking her not to tell the deceased. The other testified that in July the deceased had remarked in defendant's presence that he had taken out a $50,000 insurance policy for her benefit. The respondent argues that this supports the conclusion that she killed her husband to enable her to use whatever he had to repay her friends. She testified that she borrowed this money for her husband, at his request, telling the lenders what he told her to tell them. There is no evidence that she used any of the borrowed money, which nearly equals a business debt paid about that time by the deceased. She denied having ever heard of an insurance policy, and it was not shown that one existed. It does appear that the deceased was in financial trouble, and that she knew it. It is also argued that she killed her husband

because she knew he was living with another woman in San Pedro. This contention is made for the first time on appeal and is not too forceful, in view of the evidence as a whole. While there is some evidence of a motive, it can hardly be said to be convincing.

The evidence is entirely circumstantial and cannot be held to be both consistent with the idea of guilt and inconsistent with any other rational hypothesis. It does not meet this test with respect to the time element or the identity of the killer, even if it could be deemed sufficient as to the place where the killing occurred. Not being sufficient to establish the essential facts, beyond a reasonable doubt, it does not sustain the judgment. (*People* v. *Lamson,* 1 Cal.2d 648 [36 P.2d 361]; *People* v. *Perkins,* 8 Cal.2d 502 [66 P.2d 631].) While some suspicious circumstances appear, a conviction cannot rest upon mere suspicion or conjecture.

It is unnecessary to consider the many assignments of error in connection with the evidence and instructions. The trial lasted nine weeks, many hours were wasted on immaterial and trivial matters, and dozens of worthless exhibits were introduced. These factors were confusing at best and may well have caused the jury to consider the question of where the killing occurred, presented repeatedly and at great length throughout the trial, as the controlling issue.

It may be that the defendant knew more about this matter than she told, and the prosecution should not be foreclosed from retrying the case if better evidence has become available. The judgment and order are reversed, and the cause remanded for a new trial.

Griffin, J., and Mussell, J., concurred.