[No. 21003. Department One. — November 11, 1893.]

## THE PEOPLE, Respondent, v. RUBE MITCHELL, Appellant.

CRIMINAL LAW—HOMICIDE—CIRCUMSTANTIAL EVIDENCE—MISCONDUCT OF JURY—EXPRESSION OF PUBLIC OPINION—PRESUMPTION OF INFLUENCE.—Where the evidence upon a prosecution for murder is mainly circumstantial, and the result depended upon the degree of credit properly attaching to the statements of the witnesses, and upon the exercise of careful discrimination and sound judgment by the jury, and some of the jurors during the trial repeatedly visited a resort of lewd women and profligate men kept by a woman who had lived with the defendant and who was one of his principal witnesses, and there conversed in reference to the case, and subsequently the judge of the court delivered an admonition to the jurors upon their conduct, which was published at length in a newspaper under the head of "What Does It Mean?" and the sheriff who was a witness for the prosecution, made remarks to the jury calculated to prevent the jury from disagreeing on account of those visits, it must be presumed that the jury were influenced by a fear of public opinion in convicting the defendant, and a verdict of conviction rendered under such circumstances should not be upheld.

ID.—EVIDENCE—DRILL OF MILITARY COMPANY—ORDER OF OFFICER—ILL-FEELING OF DEFENDANT.—Where it appeared that the deceased was a member of a military company, which had been drilling on the night of the homicide, evidence that the defendant had been ordered out of the way by the officer of the company, other than the deceased, when it was engaged in skirmish drill, is not admissible to show ill-feeling by the defendant toward the deceased.

ID.—PROOF OF COMMISSION OF CRIME BY THIRD PERSON—ACQUITTAL IMMATERIAL.—Evidence is admissible on the part of a defendant tending to show that another person committed the crime, and the fact that such other person had been tried and acquitted for the same offense does not alter the case. The judgment of acquittal of such third person is not admissible in evidence upon the prosecution of the defendant.

APPEAL from a judgment of the Superior Court of Tehama County, and from an order denying a new trial.

The facts are stated in the opinion.

*Clay W. Taylor*, and *Johnson & Chase*, for Appellant.

*Attorney-General W. H. H. Hart*, and *Deputy Attorney-General W. H. Layson*, for Respondent.

SEARLS, C.—The defendant was informed against for the crime of murder, and convicted for killing Oscar Crandall at the county of Tehama, on the twenty-fourth day of April, 1891. The appeal is from a final judgment, and from an order denying a motion for a new trial.

On a former trial defendant was convicted of murder, and on appeal to this court a new trial was ordered. (*People* v. *Mitchell*, 94 Cal. 550.)

C. A. Boyden and Frank Hughes were charged in the same information with defendant; Boyden had been tried, and acquitted, and Hughes had been discharged without a trial.

It appears, also, that one Long had been indicted or informed against by a separate proceeding for the same offense, and upon a trial had been acquitted.

Oscar Crandall was a member of a military company, and on the evening of April 23, 1891, which was a bright moonlight night, had been out with his company drilling. The defendant was on the ground where the drill was carried on. About eleven o'clock P. M. Crandall, with four comrades, repaired to the Arcade saloon at the corner of Main and Hickory streets, Red Bluff, kept by Henry Rathja, passed into a back room, and engaged in a game of cards. Crandall did not participate in the game, but witnessed it. Some time later, and according to a preponderance of testimony after twelve o'clock, the defendant entered the saloon, passed to the back room, remained a brief period, returned to the front room, met C. A. Boyden, who had come in, engaged in conversation with him, and the two went out together.

About the same time, according to the testimony of Rathja, Crandall arose and walked out the back door upon a high porch which overlooked a back yard, with a gate at the side near the steps leading down from the

porch opening into Hickory street, and commenced talking in imitation of a Chinaman.

While so talking, some one in Hickory street replied to him, whereupon a conversation involving threats and much vulgarity and obscenity was heard.

Crandall evidently went down the steps and to the gate which was open. A pistol shot was heard, and Crandall was found near the gate insensible, shot through the head and with a contused wound on the head near where the bullet entered, from which wounds he died a few hours later.

The theory of the defendant at the trial was that he was at a saloon until the south-bound Oregon express arrived (due 11:50 P. M.); that he rode back on the 'bus of the Tremont hotel to the Cone and Kimball's corner, where he jumped off, went to Rathja's saloon, talked with Boyden, who wanted some opium; that they went to his, defendant's, house one and one-half blocks away, and while in the act of administering a "shot of opium" to himself and Boyden they heard the shot, and a few moments after Hughes rushed in and said a man was shot, whereupon the three men ran to the spot, found the body, and carried it around to the front of the saloon.

The testimony on the part of the prosecution was mainly circumstantial. One witness, who heard the conversation between Crandall and his supposed slayer, identified one of the voices as that of defendant.

Numerous witnesses testified to the fact that at the time the supposed fatal shot was fired defendant was in his house on High street.

Upon the whole case as made by the testimony it may be said the result very properly depended upon the degree of credit which properly attached to the statements of many of the witnesses.

Under such circumstances the office of the jury was one calling for the exercise of careful discrimination and sound judgment.

The trial of the cause commenced October 14, 1892.

Mary Howard, a woman who lived with the defendant on High street in Red Bluff, and who was an important witness on his behalf, and who, it is apparent, kept a disreputable place, files an affidavit and is supported by other and reputable witnesses showing that four of the jurors, at ten o'clock at night, visited her place, drank intoxicating liquor, and that two of the jurors talked with her about the case; that the four jurors were at her house on another night during the trial, and that one of them visited her a number of times during the trial and while the testimony was being taken.

This conduct became so notorious that on the twenty-eighth day of October the judge of the court took occasion to deliver to the jury a somewhat lengthy and most sensible admonition, in which he dwelt upon the duty of jurors to refrain from intercourse and associations with parties and witnesses intimately connected with the case, and closed his remarks by stating that unless his suggestions were literally followed the jury would be placed in the custody of the sheriff.

The admonition of the court was published at length in the *Daily Sentinel,* a newspaper published in Red Bluff, under the heading of "What Does It Mean?"

Subsequently, and while some of the jurors were discussing the conduct of the jurors in visiting the Howard place on High street, the sheriff of the county, who was an important witness on behalf of the prosecution, approached them and declared to them: "If those fellows who were down on High street hang this jury, there will be hell to pay, and you'll all be in it."

The sheriff and one other witness admit the language charged to have been used by him to the jurors, except that they deny that he said "you'll all be in it."

The jurors implicated filed affidavits admitting the visits to Mary Howard as charged; say they only took one small glass of beer each, and those shown to have been there at other times and to have conversed with the Howard woman deny that it had any effect on their verdict.

On Monday, October 31st, the jury was ordered into the custody of the sheriff, and remained in his charge until November 3, 1892, when a verdict was rendered.

While thus in custody of an officer, John Tait, one of the jurors, on, to wit, the evening of November 2d, separated from his fellows and went to the town of Tehama, twelve miles distant, where he remained over night with his family, returning the next morning.

In justice to him it must be stated that his wife was dangerously ill, and his conduct was doubtless prompted by natural affection, and no suspicion attaches to him. That he should have applied to the court for leave to thus separate from his fellow-jurors is true beyond cavil. The purity of the motive, however, takes away the sting of the offense.

Another juror separated from the jury while in custody of the officer, and visited the postoffice to post a letter.

It incidentally appears that the residence of Mary Howard was the resort of lewd women and profligate men. A number of these women were witnesses in the case.

That four of the jurors should have visited this place indicates a lack of that high appreciation of the duties and responsibilities of jurors essential to the purity of the jury system, is quite apparent. That one, at least, if not two of them should have repeatedly visited such a place under such circumstances, and there conversed in reference to the case on trial, a case which involved the life and liberty of a man whose home was there, the place around which clustered many of the prominent actors and acts in the case, furnishes indubitable proof either of a willingness to do wrong, or, what is more probable, an entire lack of any adequate conception of the position which, as jurors, they occupied.

It may appear at first blush that the friend and witness of defendant, having been largely instrumental in bringing about the condition of which he complains, it cannot be presumed that he was injured thereby, and

that to yield to his plaint will result in encouraging other men charged with crime to resort to like practices.

This is but a surface view of the case, and when we go deeper we find that the jurors in question had compromised themselves; that their position had been exposed; that the public was watching them with a suspicious eye, and that henceforth they could only allay that suspicion and vindicate themselves from it by convicting the defendant. Their freedom of action was foreclosed.

Amid all the notoriety given to their conduct there can be no reasonable doubt but that the jurors understood fully the unfortunate position in which they were placed, and the temptation to escape by the most practicable mode, viz: by convicting the defendant, was too strong a one to be reasonably resisted by such men under such circumstances.

It is plain that all this tended to the injury of the defendant, and a verdict rendered under such circumstances should not be upheld.

It is unfortunate for the jury system and for the cause of justice that such episodes should occur in the trial of causes, but the evil will be soonest suppressed by wiping out verdicts rendered under such circumstances.

The other errors assigned need not be noticed at length. The evidence in relation to defendant having been ordered out of the way when the military company was engaged in skirmish drill seems to us as too remote. The order was by an officer of the company, and not by deceased, and any inference of ill-feeling by defendant to the deceased by reason thereof would seem strained. It is not regarded as of sufficient importance to call for a reversal, but it is recommended that upon another trial the evidence be excluded.

The testimony tending to show that one Long was the guilty party was admissible. It is always proper to show that some other person, and not the defendant

committed the crime with which he is charged, and the fact that Long had been tried and acquitted did not alter the case. The argument of respondent that if defendant could try to prove Long's guilt, the people could show the judgment of acquittal is not sound, for the simple reason that a judgment as between the people and Long is not evidence in a case of *The People* v. *Mitchell.*

The judgment and order appealed from should be reversed and a new trial ordered.

TEMPLE, C., and BELCHER, C., concurred.

For the reasons given in the foregoing opinion the judgment and order are reversed, and a new trial ordered.          PATERSON, J., GAROUTTE, J., HARRISON, J.

Hearing in Bank denied.