[Crim. No. 4063. In Bank.—March 26, 1937.]

THE PEOPLE, Respondent, v. WILLIAM PERKINS, Appellant.

Donald P. Nichols, Allan J. Carter and W. I. Gilbert for Appellant.

U. S. Webb, Attorney-General, R. I. McLaughlin, Deputy Attorney-General, and Stanley Mussell, District Attorney, for Respondent.

SEAWELL, J.—Since granting the petition for a hearing herein we have made a re-examination of the points therein urged as grounds for a hearing by this court, as well as all questions raised on the appeal, and we are of the view that the opinion and decision of the District Court of Appeal, Fourth Appellate District, prepared by Turrentine, J., *Pro Tempore,* fully and correctly disposed of all the questions raised by the appeal. It is hereby adopted by this court as a correct statement of the facts and the law applicable to the case, as amended and corrected in minor respects by said District Court of Appeal upon rehearing granted, and, as so corrected, adopted by said court as a *per curiam* decision. We have added to said opinion our own observations which we deem pertinent to the issues in view of certain points stressed in the petition for a hearing by this court.

The opinion follows:

"The defendant William Perkins stands convicted of murder in the first degree, upon which conviction a judgment of life imprisonment has been entered. He prosecutes this appeal both from the judgment and from the order denying a new trial.

"That the deceased, David Philip Kirk, known as 'Skippy', was murdered in the city of Ontario on the morning of December 31, 1935, is admitted. The evidence connecting the defendant with the murder is purely circumstantial. The record discloses that Kirk had been living in a small two-room house and that the defendant had been living with him for about ten or twelve days before the murder. Kirk was about sixty years of age and defendant about twenty-three. Kirk operated a penny ante poker game in partnership with one Clark. A poker game broke up at about one-thirty o'clock on the morning of December 31, 1935. The defendant and Kirk had been in the building substantially all evening and were in the house together when the game broke up. Thereupon the players left and Kirk and defendant remained in the house and went to bed. Kirk slept in the east room and the defendant in the west room. Kirk died at about 5:45 o'clock that same morning. He had been strangled and his skull was fractured. Defendant testified that he saw Kirk have $7 and other bills on his person the night prior to the murder. Thus far the evidence is without conflict and is conceded by both sides to be substantially correct and to establish beyond a reasonable doubt that Kirk was murdered.

"The evidence connecting defendant with the murder of Kirk may be fairly stated as follows. Several witnesses testified that between twelve, midnight, and 1:20 on the morning in question they saw Kirk have in his possession paper money which they estimated to aggregate about $20 to $25. Other witnesses testified that Kirk had a new dollar bill of the 1935 series on the evening prior to his murder and that he had called their particular attention to this bill and at the same time showed them several of the new issue of twenty-five cent pieces which he also had in his possession at that time.

"After Kirk's death some of the coins were found on the floor near his body and others were found on his person but the bills were missing and were never found either on his person or in the house. The testimony showed that Kirk ordinarily, and on the night prior to his death, carried his money in one of the pockets of a khaki shirt which he had worn that night and which he wore to bed that night.

"Defendant testified that he and Skippy retired to their respective beds about 1:30 o'clock on the morning of December 31, 1935, and that defendant went to sleep almost immediately; that he was sleeping between two mattresses; that

he was awakened shortly before dawn by 'someone hollering'; that he thought the person from whom the sound issued was Skippy; that the sound was muffled; that shortly after he heard the above-mentioned sound some unknown person jumped on the bed which he was occupying and on top of the upper mattress and held him on the bed in such a manner that he could not escape; that as he continued his struggle to get away and was about to succeed in his effort the intruder left off and ran into the other room and then out of the house; that he began to arise and just as he did so he slipped and fell but recovered himself and jumped up and followed the intruder.

"Defendant further testified that he ran out of the house on the porch and to its east end and about 15 steps therefrom and then saw two men running up the alley, that he thought he shouted at the men to stop, that he discontinued his pursuit of the men and returned to the house where he discovered Skippy lying on the floor, that he spoke to Skippy but received no answer, that he procured a cup of water and sprinkled some of the water over Skippy's face, that he then left the house and went to another dwelling next door for the purpose of securing assistance. One witness, Elsie Dickey, testified that, a few minutes after 6:15 o'clock of the specified date, and while it was yet dark, the defendant came to her door and said that he wanted help, that she told the defendant that there was no man in her house who could assist him and the defendant then went away. Mr. Ireton, who lived next door to the house occupied by Skippy, testified that the defendant came to his house about daybreak on December 31, 1935, and requested help and that the defendant then stated that two men had entered Skippy's house and had beaten 'Hell out of both of us'. The witness Ireton also testified that he directed the defendant to go to a house on the corner and that shortly thereafter the defendant returned to the Ireton dwelling and again requested assistance that he, Ireton, promised to come but later called across the fence and suggested that the defendant call the police. Ireton further testified that shortly after defendant left his house he looked over at Skippy's house and saw someone walking in the house and then walk over to the window in the west room, and he then saw someone's hand moving the bottom of the screen on the window back and forth. This was the window,

according to defendant's testimony, through which the two men had entered his room.

"Approximately at 6:30 a. m. defendant went to the ice plant and telephoned the police asking them to come to his assistance but gave them a wrong address for Skippy's house. Defendant testified that while waiting for the police to come he succeeded in getting Skippy up onto the bed; that he heated some water and took a towel and washed some of the blood off Skippy's face; that he then put cold water on his forehead in endeavoring to restore him to consciousness.

"Sometime later defendant's attention was called to the fact that he had given a wrong address to the police and he then called the department, giving a correct address.

"Several witnesses testified that shortly after they arrived at the scene of the murder they discovered defendant had blood on his clothes and that they also saw certain scratches and cuts on his face, neck and body. Defendant said that he had not been in a fight the day or evening before the murder but stated he got the scratches from the mattress while he was being held down and that his assailant did not touch him. The police doctor testified that he found human skin and blood in the debris which he removed from under the finger nails of Kirk.

"The chief of police testified that he arrived at the house and saw defendant for the first time at approximately seven o'clock on the morning the murder was committed; that he talked to defendant and that during the conversation defendant pointed out the window in his room where he claimed the two men had entered; that he examined the window and window sill; that there was dust and dirt on the window sill and that it had not been disturbed recently. The window was approximately 30½ inches high and about 14 inches wide and was about three feet above the porch outside. The window had been covered by a screen which was partly loosened from the bottom and left side.

"Certain witnesses testified that there was dew on the ground in the early morning of December 31, 1935, and that they examined the ground for footprints. One witness, Dr. Abbott, who was the police surgeon, testified that he looked for footprints on the ground and found none, but that when he arrived at the alley he found tracks going up and down the alley.

"Mrs. Murphy testified that on January 18, 1936, she and her 7-year-old son found three five-dollar bills, and four one-dollar bills, in a hole in a pepper tree across from a Mrs. Dickey's house. This was the green house on the corner where defendant admitted he had gone for help on the morning in question. She further testified that there was a growth of brush around the foot of the tree partially concealing the hole where she found the money. This hole was about a foot and a half above ground. The pepper tree was some 200 or 300 feet from the Kirk premises. The money was immediately turned over to the police and was subsequently introduced in evidence at the trial. One of the dollar bills was of the new 1935 series similar to the one which Kirk had displayed the night prior to the murder.

"The witness, Dr. Abbott, testified that during the morning of December 31, 1935, he saw the piece of wood which was then in the hands of a police officer and that he saw a gray hair on it. This witness also testified that Kirk had not only been strangled to death but that he had been struck over the head with a blunt instrument with sufficient force to fracture his skull; that defendant told the officers on the morning of his arrest that it was from forty-five minutes to an hour between the time he was able to get out of bed and the time the police arrived in answer to his call. The first officer arrived approximately fifteen minutes after the first call by defendant to police.

"On this state of the evidence the defendant challenges its sufficiency to sustain a conviction. His contention is that the Supreme Court in the case of *People* v. *Lamson,* 1 Cal. (2d) 648 [36 Pac. (2d) 361], laid down the following rule: 'Resting its case upon circumstantial evidence, the prosecution must not only show a set of circumstances consistent with guilt, but must show a set of circumstances inconsistent with any reasonable theory of innocence.' It is also urged that the decision in *People* v. *Staples,* 149 Cal. 405 [86 Pac. 886], is controlling in this case and requires a reversal of the judgment. The following language is declared to be peculiarly pertinent to the situation here presented: 'It will be perceived that the evidence in the case relied on to establish the guilt of the defendant is practically circumstantial, and it is elementary law that where the evidence is of such a character it must be not only consistent with the hypothesis of guilt, but inconsistent with any other rational hypothesis.

The deduction to be drawn from these circumstances is ordinarily one for the jury, but where, in a case such as this, every circumstance relied on as incriminating is equally compatible with innocence, there is a failure of proof necessary to sustain a conviction, and the question presented is one of law for the court. The prosecution has the burden of proof. The defendant is presumed innocent until the proof satisfies the jury beyond a reasonable doubt of his guilt. The right of a jury to return a verdict of guilty is not an arbitrary right. The sufficiency of their verdict must be tested by determining whether the evidence upon which that verdict is framed was of such a character that they could say from it that in their judgment no reasonable doubt of the defendant's guilt existed.'

■ ''In each of the above cited cases the question as to whether or not a murder had in fact been committed was one of the matters which the prosecution attempted to establish by circumstantial evidence. In the case before us the fact that a murder had been committed is conceded and we are only considering whether or not the circumstantial evidence is sufficient to connect the defendant with, and to convict him of, the murder. Where the commission of the offense charged is conceded and it is left to be determined only who was the perpetrator of the crime we think the proper rule is laid down in the case of *People* v. *Tom Woo,* 181 Cal. 315 [184 Pac. 389], where it is said: 'In passing upon this question (the sufficiency of the evidence) we will not attempt to determine the weight of the evidence, but will decide only whether upon the face of the evidence it can be held that sufficient facts could not have been found by the jury to warrant the inference of guilt. For it is the function of the jury in the first instance, and of the trial court after verdict, to determine what facts are established by the evidence, and before the verdict of the jury, which has been approved by the trial court, can be set aside on appeal upon the ground we are discussing it must be made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the court below. The determination of a charge in a criminal case involves proof of two distinct propositions: First, that the offense charged was committed, and, second; that it was perpetrated by the person or persons accused thereof. In this case there can be no doubt of the first proposition, . . . Did these de-

fendants commit or participate in the commission of the murder? What facts can we say the jury could have resolved from the evidence in order to justify the inference of guilt? We must assume in favor of the verdict the existence of every fact which the jury could have reasonably deduced from the evidence, and then determine whether such facts are sufficient to support the verdict.'

"In *People* v. *Latona*, 2 Cal. (2d) 714 [43 Pac. (2d) 260], the Supreme Court said: 'However, as was said in *People* v. *Martinez*, 20 Cal. App. 343, 345 [128 Pac. 952], if "the circumstances reasonably justified the conclusion of the jury expressed in their verdict, and even though this court were of the opinion that such circumstances might be reasonably reconciled with the innocence of defendant, such fact does not warrant interference with the determination of the jury." (Citing cases.) . . . The circumstantial evidence produced convinced the jury beyond a reasonable doubt under the instructions of the court of the guilt of the appellant, and it is not the province of an appellate court to overturn such a conclusion, except it be determined that there was no evidence to sustain it. (*People* v. *Tom Woo*, 181 Cal. 315 [184 Pac. 389].) . . . The right to draw proper inferences from the evidence is a function of the jury; and as long as its conclusions do not do violence to reason, an appellate court is not permitted to substitute its finding of the ultimate fact for that reached by the constitutional as well as the statutory arbiter thereof. Circumstantial evidence may be as convincing in its force and as conclusive as the testimony of witnesses to an overt act. (*People* v. *Kneiling*, 127 Cal. App. 151 [15 Pac. (2d) 561].)'

"We thus observe that the decision in *People* v. *Tom Woo*, *supra*, has been cited with approval since the decision of the case of *People* v. *Lamson*, *supra*.

"The jury was entitled to believe that Kirk had from twenty to twenty-five dollars on his person the night prior to the murder; that he took the money to bed with him and that the next morning most of his money was missing from his person. It was therefore justified in concluding that he had been murdered in the course of being robbed. This, of course, would be murder in the first degree. (Pen. Code, sec. 189.) The physical evidence demonstrates that the money was not taken either with his consent or without force.

"In view of all the evidence, including the evidence of fresh scratches and cuts on the face, neck and upper body of the defendant, his denial that he had been in a fight the evening or day before the murder, and particularly the evidence that the murdered man had human skin and blood beneath his finger nails immediately after the murder, the circumstances strongly connect the defendant with the crime. Applying the rules above stated to the evidence we think there was clearly sufficient evidence upon which the jury was entitled to find, and did find, the defendant guilty of murder in the first degree.

"During the closing argument of the district attorney a certain portion thereof was stated in the form of a question and counsel for the defense interrupted and the following colloquy took place: 'Mr. Carter: If you are asking me a question I would like the opportunity of answering you. Mr. Kavanaugh: I will have to ask you not to interrupt me. Mr. Carter: Then don't ask me any questions. Mr. Kavanaugh: I will ask you all the questions I want to. Mr. Carter: If you do I will answer them. The Court: No, you won't. Mr. Kavanaugh: I am addressing myself to the jury and Mr. Carter knows it well. The Court: There is no necessity for this discussion between counsel. Proceed with the argument. Mr. Carter: I except to counsel's remarks and to the remarks of the Court.' It seems obvious to us that this was a rhetorical question and that the district attorney made this clear in his reply to the defense counsel inquiries. In any event the court was not requested to instruct the jury to disregard the same and no error could be predicated thereon under the circumstances.

"We think the evidence respecting the finding of the money in the pepper tree, although it was found some eighteen days after the murder, was admissible in view of all the other evidence and evidence of the opportunity available to the defendant to have placed it there. The weight of the evidence and the inferences to be drawn therefrom were peculiarly for the jury to pass upon. This entire matter was a circumstance which the jury had a right to consider along with other circumstances and evidence in arriving at their verdict.

"Photographs of the premises where the offense was committed, taken February 17, 1936, were admitted in evidence and it is claimed that this was error because the build-

ing and the grounds around it had been changed. However, this could not possibly have prejudiced the defendant as other photographs of the same premises taken the day after the alleged murder were also in evidence, and any changes which had been made were clearly demonstrable.

■ "The defendant was not permitted to testify that he had been promised a job to go to work on the morning of December 31, 1935. Defendant also attempted to prove by a Mr. Flynn that for several weeks prior to the murder Flynn had been acting as a banker and had a considerable cash deposit of deceased's money in his possession at the time of the alleged murder and that Kirk had referred to defendant as 'his boy'. Defendant contends that all of these matters were admissible in evidence as bearing on the question of motive and the refusal of the trial court to admit them constitutes reversible error. Appellant relies upon the case of *People* v. *Kelley*, 208 Cal. 387 [281 Pac. 609], as an authority justifying the admission of this evidence. In that case the sole question was the motive, as the commission of the crime had been brought home to the defendant.

"In the instant case the only motive involved was robbery of the murdered man. Anything that had a bearing on robbery as a motive was, of course, admissible, but evidence regarding other motives was not admissible. This, we think, is the true rule and is not in conflict, but in accord with the rule laid down in *People* v. *Kelley, supra*. If this be the correct rule then it is difficult to see how evidence that the deceased had other money, not in his possession, could bear on robbery as a motive for the commission of the crime. The same can be said of the evidence of Mr. Flynn that the deceased referred to the defendant as 'his boy', which, so far as the evidence shows, had never been communicated to the defendant. It is not so clear that the evidence that the defendant was promised a job for the next day was inadmissible as bearing on motive for robbery, but its exclusion was not, in our opinion, prejudicial or reversible error.

■ "Defendant called Mrs. Ireton to the stand and asked her what the defendant had said to her when he came to her house at about 6:15 on the morning of the murder which was at least a half hour after Kirk had died. On objection being made she was not allowed to answer the question. Defendant contends that the evidence was admissible under the *res gestae* rule. 'The rule (*res gestae*) is familiar and permits

the declarations of the defendant to be shown where they are so closely connected with the main event as to appear wholly unpremeditated and spontaneous.' (*People* v. *Dad*, 51 Cal. App. 182 [196 Pac. 506].) It may be stated that where it is the event speaking through the person and not the person telling about the event, that such declarations are part of the *res gestae* and admissible in evidence. There had been sufficient elapsed time to allow the defendant to think over the event and, in fact, he had left the immediate scene of the crime and had sought some person to tell of the event. Under these circumstances the trial court was correct in ruling that the conversation was not a part of the *res gestae* and that the same was inadmissible as self-serving declarations.

██ "The trial court did not err in refusing to admit evidence of threat made on the life of Kirk by persons other than defendant shortly before the murder. The rule is clearly laid down in *People* v. *Mendez*, 193 Cal. 39 [223 Pac. 65, 70], where the Supreme Court said: 'The trial court expressed the view that evidence tending merely to show that persons other than the defendants may have had a motive for the commission of the crime was inadmissible unless coupled with other evidence having an inherent tendency to connect such other persons with the actual commission of the crime. . . . We are inclined to agree with these conclusions of the trial judge. We do not find any California case directly in point upon the question whether evidence of motive upon the part of some one other than the defendant for the commission of the crime charged is admissible, in the absence of other evidence tending to connect such other persons with the commission thereof. "It is always proper to show that some other person and not the defendant committed the crime with which he is charged." (*People* v. *Mitchell,* 100 Cal. 328, 333 [34 Pac. 698, 700].) The question herein is what kind and quality of evidence is essential to that end, . . . It seems clear that a defendant, in order to exculpate himself, should not be required to establish the guilt of a third person with that degree of certainty requisite to sustain a conviction of the latter. On the other hand, it seems equally clear that evidence which simply affords a possible ground of possible suspicion against another person should be inadmissible. The decisions in other states are not completely harmonious upon this question. But they are substantially unanimous in holding that mere evidence of motive in another person, or of motive coupled with threats

of such other person, is inadmissible unless coupled with other evidence tending to directly connect such other person with the actual commission of the crime charged. (See notes to 1 Wigmore on Evidence, 2d ed., secs. 139–142.) The learned author criticizes the rationale of these decisions somewhat severely, but concedes that they are substantially unanimous upon this point. It seems to us that there is a sound basis for this rule and that it rests fundamentally upon the same consideration which led to the early adoption of the elementary rules that evidence to be admissible must be both relevant and material. It rests upon the necessity that trials of cases must be both orderly and expeditious, that they must come to an end, and that it should be a logical end. To this end it is necessary that the scope of inquiry into collateral and unimportant issues must be strictly limited. It is quite apparent that if evidence of motive alone upon the part of other persons were admissible, that in a case involving the killing of a man who had led an active and aggressive life it might easily be possible for the defendant to produce evidence tending to show that hundreds of other persons had some motive or animus against the deceased; that a great many trial days might be consumed in the pursuit of inquiries which could not be expected to lead to any satisfactory conclusion.'

■ "The trial court did not abuse its discretion in permitting the jury, over the objection of defendant, to view the scene of the crime. Although there had been some changes in the building the changes were not material to the contentions of the defendant. The trial court, by consent of counsel, pointed out different objects and described them. Certainly no abuse of discretion appears. In the case of *People* v. *Pompa,* 192 Cal. 412 [221 Pac. 198], it is said: 'The fact that physical conditions upon or about the premises may have been to any degree altered is a fact to be considered by the trial court in exercising its discretion to permit or refuse to permit such view and its conclusion in that regard will not be disturbed upon appeal in the absence of a clear showing of an abuse of such discretion. No such abuse of discretion is disclosed by the record in this case'.

■ "An examination of all of the instructions and comments of the trial court on the evidence leads to the conclusion that these comments were all within the constitutional limitation and within the limitation approved by the Supreme Court

in *People* v. *De Moss,* 4 Cal. (2d) 469 [50 Pac. (2d) 1031]. While the trial court commented somewhat on the weight of the evidence it at all times impressed upon the jury that they were the sole judges of the facts and that they should accept defendant's story if they believed it. This admonition was given at the introduction of the instructions, at the time comments were made upon the evidence, and at the conclusion of such comments. The comments made seem to coincide with the purpose and spirit of the constitutional amendment permitting the same. An example of the caution exercised is contained in the following statement of the trial court: 'I wish to warn you again, ladies and gentlemen, that nothing I can say or should say indicates, what I would believe or what I would do if I were on the jury. It is merely for the purpose of directing your attention, if I may, to what seems to me to be the crucial points in the testimony in this case.'

"Appellant contends that the trial court erred in instructing the jury that they could either return a verdict of guilty of first degree murder, or a verdict of not guilty. In view of the evidence that Kirk was not only murdered but also robbed at the same time, if the jury believed defendant committed the crime, the only verdict they could possibly have returned was one of guilty of first degree murder. (*People* v. *Petro,* 13 Cal. App. (2d) 245 [56 Pac. (2d) 984]. See, also, *People* v. *Mott,* 211 Cal. 744 [297 Pac. 23].)

"While appellant complains of the trial court's refusal to give certain requested instructions we find that the same matters were fully covered in other instructions. This was sufficient. (*People* v. *Garcia,* 2 Cal. (2d) 673 [42 Pac. (2d) 1013].)

"The other alleged errors complained of by appellant respecting the admission or failure to admit evidence do not seem substantial and in no way affect the merits of the same."

The law as to what constitutes *res gestae* as applied to criminal cases is so firmly settled by the decisions of this state that a long list of cited cases would only mean a multiplicity of authorities in support of a fixed rule. It is admitted that the testimony of the witness Mrs. Ireton, whatever may have been its specific purport, related to declarations made by the defendant when he supposedly was in the room in which the deceased was killed not less than one-half hour after the homicide had been committed, and that possibly

said declarations were made after a longer period had intervened. The defendant had left the premises after the homicide and gone to a neighboring residence in quest of assistance, and after having had a short conversation with said neighbor had returned to the room in which the body of the deceased lay. It was then upon his return that the declarations presumably were made by the defendant which he attempted to introduce in evidence through the testimony of Mrs. Ireton.

The admission of such evidence would have violated the cardinal rule that self-serving declarations are not admissible and in order to entitle any statement made by the defendant to admission it must be shown that it is within the rule denominated *res gestae,* which means that the declaration must be the "natural and spontaneous outgrowth of the act or assault", and not a mere narration of a past transaction. The *res gestae* include words and acts which are so closely connected with the main fact as to constitute a part of the transaction, and without a knowledge of which the main fact might not be understood. "They are the events themselves speaking through the instinctive words and acts of the participants; the circumstances, facts and declarations which grow out of the main fact, are contemporaneous with it and serve to illustrate its character." (Ballentine's Law Dictionary.)

A number of cases may be cited in which the declarations or exclamations were made less than a half-hour after the homicide was executed or the assault was made and were held inadmissible on the ground that such evidence was no part of the *res gestae,* but was self-serving and hearsay. In *People v. Dad,* 51 Cal. App. 182, 187 [196 Pac. 506], the declarations were made by the defendant as he walked from the restaurant where the homicide occurred some little time thereafter, and while "the smoke of the battle was still in the restaurant". His statement "I protect myself", and a declaration justifying his assault were excluded on the theory that the defendant "had ample time to contemplate a possible defense".

The declarations in the instant case do not purport to consist of an outcry, nor to have been made while engaged in the conflict, nor were they the natural and spontaneous outgrowth of any assault, but they were purely self-serving statements made long after the assault had been committed

and the defendant had left the scene and subsequently returned to it. The trial court did not commit error or abuse its judicial powers in excluding such testimony. (*People* v. *Hinshaw*, 194 Cal. 1 [227 Pac. 156] ; *People* v. *Anderson*, 120 Cal. App. 5 [7 Pac. (2d) 202] ; *People* v. *Westcott*, 86 Cal. App. 298 [260 Pac. 901].) No further citation of authorities is necessary for the support of the well-recognized principle of law that self-serving declarations and hearsay evidence cannot be invoked to displace or destroy the efficacious and proper application of the *res gestae* doctrine.

We think there is no substantial merit in the complaint that the exclusion of evidence to the effect that the defendant was promised a job of work in the immediate future was improper. Said evidence in no way tended materially to affect or change the situation as it existed at the time of or immediately before the homicide. The district attorney approved and commented on the situation of the defendant as it existed at *the time the homicide was committed*. Defendant had been living at the home of the deceased about ten days, was without money and was running a charge account at a nearby store. The exclusion of evidence tending to show that he had a promise of work, or an expectation, or possibility, or opportunity in common with all others, is not a matter of great importance. The jury could, and no doubt did, take notice of the fact that the usual opportunities to obtain employment were open to him, and that it by no means follows that a person without work will kill to obtain money, rather than earn it. The prosecution offered evidence tending to prove the condition of the defendant at the time of the homicide and drew such inferences from the situation as it existed as it believed to be justified by the case presented. If its inferences and deductions were unwarranted the jury as reasonable men would not follow specious reasoning. There is so little evidentiary substance to the claim that the refusal to admit evidence that the defendant had the promise of a job constituted reversible error, as to reduce it to a minimum in importance.

Appellant presses on our attention the rule which frequently finds expression in our decisions to the effect that the circumstances relied upon to establish the guilt of one accused of crime must be consistent with that hypothesis and inconsistent with any other rational conclusion. In other words, where the incriminatory circumstances relied upon

are equally compatible with innocence, a reviewing court will reverse a judgment of conviction, and a like application of that rule to this case, it is claimed, would impel a reversal of the judgment. The rule above announced does no more than to instruct the jury that if a reasonable doubt is created in their minds for any reason they must acquit the defendant. But where the jury rejects the hypothesis pointing to innocence by its verdict, and there is evidence to support the implied finding of guilt as the more reasonable of the two hypotheses, this court is bound by the finding of the jury.

The evidence offered tending to establish that other persons had threatened the deceased with violence is not ordinarily admissible as tending to show the defendant did not commit the crime. The rule is that the evidence of itself must be inherently sufficient to prove that the person accused committed the crime, and if that is established beyond a reasonable doubt and to a moral certainty it excludes all others from participation in the crime except coconspirators.

We have considered the argument of appellant as to the insufficiency of the evidence to support the verdict. We are of the view that it is unquestionably sufficient. The attempt of the defendant to account for himself and explain the homicide is set out in a somewhat weird and unreasonable story which evidently did not impress the jury. It abounds in improbabilities, and the jury was the judge of its reasonableness. An instruction which is frequently given in criminal cases is to the effect that in judging the credibility and the weight to be given to the testimony of any witness consideration is to be given to the reasonableness of the witness' statements. The jury no doubt gave heed to the above announced principle in considering the credence to be given to defendant's story.

The finding of the currency in the base of the pepper tree was also a strong link taken with all the other circumstances tending to connect the defendant with the commission of the crime. Of course, the defendant had to dispossess himself of the currency if he committed the crime. It was found concealed at a place where he was known to have passed shortly after the commission of the crime. It would be contrary to the rule of common sense to suppose that an outside person, who necessarily fled from the scene, would take time to conceal the money at a place within two or three hundred feet from the scene of the crime, with the intention of returning

thereafter to repossess it when he already had it in his possession. The scratches upon defendant's face and human skin found under the finger nails of the deceased, evidencing a struggle, together with the other facts of the case, tend strongly to support the verdict.

The judgment and order denying a new trial are affirmed.

Curtis, J., Shenk, J., Edmonds, J., and Waste, C. J., concurred.

THOMPSON, J., Dissenting.—I dissent.

One of the prosecution witnesses testified on direct examination that on the morning of the homicide he had made a search of defendant's person and found nine cents in his pockets which the defendant said "was all he had". During the cross-examination of defendant, who had taken the stand in his own behalf, the prosecution established that defendant had not worked for a week prior to the homicide and had borrowed money from the deceased and that at the time defendant had only nine cents. In his argument to the jury, the district attorney emphasized the fact that defendant at the time of the homicide had but nine cents in his pocket. He then argued, in part, that defendant *"had no employment, no contact, nothing except living there. There was a game there the night before, and it is uncontroverted—there is no dispute about it—that the defendant had no money of his own* . . . *he was, as we say, impecunious—busted flat*; on the other hand, he admits seeing the deceased having money. . . . Now, let us presume . . . that this defendant actually conceived the idea *in his strained financial condition,* and it appeared there that he would get a little easy money. . . . Let us conceive that the defendant *being hard up, and needing some money,* and knowing that the old man had some money, that he would conceive the idea of getting it."*

While a showing of motive is not indispensable to the establishment of an offense (*People* v. *Kelley,* 208 Cal. 387, 390, 391 [281 Pac. 609]), it definitely appears from the record herein, and particularly from the foregoing, that the prosecution in its attempt to connect defendant with the homicide relied strongly on defendant's lack of employment and his apparent need of money. In view of the emphasis placed by the People on these features and in the circumstantial state of the

evidence generally, I am of the opinion that the trial court grievously erred to the prejudice of the defendant when it sustained objections to questions intended to elicit that on the day preceding the homicide the defendant had a promise of employment. Such evidence was admissible as tending to overcome or minimize the motive or reasons advanced by the prosecution for defendant's asserted commission of the offense.

I am also of the view that the trial court erred in precluding the defendant from offering evidence, through a disinterested witness, to the effect that the deceased had been in the habit of depositing or ''banking'' money with the witness, a restaurant owner. This offer of evidence was explained by the defense as intended to show that deceased never retained or kept large sums of money with him, of which fact defendant was aware. Such evidence, if admitted, would have tended to overcome the likelihood of defendant perpetrating the heinous offense charged against him. In the face of such evidence it would not be unreasonable for the jury to assume that a person as financially distressed and as sorely in need of money as the prosecution had portrayed the defendant, would not have murdered and robbed one with such a limited amount of money available. The evidence should have gone to the jury for whatever weight it desired to attach thereto.

Then again, I am of the opinion that it was error to sustain objections to questions put to three defense witnesses, including the defendant, intended to disclose that the deceased on several occasions had referred to the defendant as ''his boy''. Evidence of this character would have a tendency to establish the amicable relations between deceased and defendant and tend to render improbable the latter's participation in his benefactor's untimely and violent death.

In view of the fact that all of the evidence tending to connect the defendant with the homicide and the robbery was meager and was circumstantial in character, any material evidence tending to prove lack of motive on the part of the defendant should have been admitted. In my opinion, the proffered evidence above discussed was material to this purpose, and the error involved in its rejection is accentuated by the circumstantial character of the prosecution's evidence tending to connect defendant with the homicide. The weight

of credibility to be attached to such evidence, of course, would be for the determination of the jury.

Langdon, J., concurred.

Rehearing denied.  Thompson, J., voted for a rehearing.