[Crim. No. 2166.   First Dist., Div. Two.   Sept. 15, 1941.]

THE PEOPLE, Respondent, v. AUGUST D. PEIRCE et al.,
Appellants.

Leo A. Sullivan and Charles H. Brennan for Appellants.

Earl Warren, Attorney General, J. Albert Hutchinson, Deputy Attorney General, Ralph E. Hoyt, District Attorney, and L. E. Dayton, Deputy District Attorney, for Respondent.

DOOLING, J., *pro tem.*—Defendants appeal from judgments upon verdicts convicting them of manslaughter and assault by means of force likely to produce great bodily harm, and from orders denying their motions for new trial.

Defendant Hancock was jailer and defendant Peirce assistant jailer of the Oakland city jail. The convictions followed the death of one Fred Fernelius who died as a result of head injuries received while confined in such jail.

Fernelius, who had been worried because of lack of work and inability to sleep, and who had apparently suffered from some intermittent delusions that he was being persecuted and threatened with harm, after drinking a portion of a quart of muscatel wine was arrested on the night of May 3, 1940, on an Oakland street and booked as a drunk in the Oakland city jail. At that time he was without hat, coat or outside shirt. To the arresting officer he seemed like a man on the verge of delirium tremens.

Fernelius spent a quiet night in the jail and on the morning of May 4 he was called out of his cell and taken with other prisoners into an exercise yard in preparation for their appearance in court. Fernelius suddenly rose from a bench on which he had been sitting, ran into the jail, collided with a trusty named ''Hurley'' knocking him to the ground by the force of the collision, and continuing into a corridor which led to the rear cells started up a flight of stairs. Defendant Peirce started to pursue Fernelius and defendant Hancock followed.

What occurred thereafter is the subject of much conflicting testimony. Peirce overtook Fernelius and a struggle ensued. Both Peirce and Hancock admit striking Fernelius on the head with their clubs to subdue him. Hancock testified that he only struck one light blow. Peirce's testimony was to the effect that Fernelius was grappling with him and in an attempt to free himself he struck a few blows backwards over his own head. The testimony of the other eye-witnesses will be referred to hereafter.

Fernelius was carried out of the jail in an unconscious condition, bleeding profusely from wounds about the head, and on May 5, 1940, at 11:30 p. m. he died. Medical testimony given by physicians who performed a post-mortem examination was to the effect that death was caused by a contused wound of the brain with extensive cerebral hemorrhage and fracture of the skull; the fracture consisting of a major linear fracture 7 4/10 inches long from the right occipital to the left parietal, and smaller fractures branching off. The decedent had two cuts across the top of his head, apparently made by some blunt instrument, which had laid the scalp open to the bone, and a contused wound on the back of his head apparently also inflicted by a blunt instrument. Fernelius' skull was unusually thin for a man's, about the thickness of a normal woman's skull with some abnormally thin areas. However the apparent point of origin of the major fracture was at almost the thickest part of the skull and in the opinion of at least one medical witness it would require a severe blow or blows to cause the brain injuries found regardless of the thickness of the skull.

The people presented three eye-witnesses of the encounter. The witness Hellman testified that because of the position of his cell he did not see Peirce and Hancock overtake

Fernelius but heard scuffling and then Fernelius backed into his view and both Peirce and Hancock followed striking Fernelius with their clubs about his head and face. Fernelius' arms were at his side and he appeared dazed and was making no resistance. Fernelius fell to the floor on his back and both defendants continued to strike Fernelius with their clubs. This witness did not see handcuffs put on Fernelius but then observed that he had been handcuffed. After the handcuffs were on the defendants continued to strike Fernelius with their night sticks while he was lying on the floor on his back. There was a pool of blood on the floor where Fernelius was lying about a foot in diameter and as he was carried out by four trusties in an unconscious condition blood was dripping from his head all the way out.

The witness Peterson testified that he was in his bunk when the sound of the scuffle attracted his attention. He got up and the first thing that he saw was Peirce's club dropping away from Fernelius' head and Fernelius reeled against the wall with blood running from his head. Peirce said: ''God damn you, now run,'' and hit him again. Fernelius put up his hands to protect himself and Peirce ''grabbed him by the arm and then hit him again and then he hit him again.'' ''The first hit he stayed up; the second hit he went down'' and then ''he hit him again.'' Fernelius first ''reeled down on his knees'' and ''then he went down in a sitting position.'' In that position the handcuffs ''were clamped on one hand. I didn't see them put them on both hands.'' After the handcuff was put on and with Fernelius in a sitting position on the floor ''Hancock hit him and then Peirce hit him.'' There was a pool of blood on the floor and blood was running from Fernelius' face and head. ''He was still . . . I don't believe he was conscious at all after the second hit. . . . He was not breathing but very little and when he did breathe he was gushing blood out of his mouth and blood was all down in front.''

The witness Santos testified that he saw Fernelius collide with Hurley. Both men fell down. Hurley tried to hold him but Fernelius broke away and ran toward the rear cells pursued by Peirce and Hancock. Fernelius started up the rear stairs and was stopped by someone coming down. Fernelius tried to ward off Peirce and Hancock by pushing and kicking at them but Peirce seized him by one wrist and pulled him from the stairs. Fernelius fell down and Peirce fell

over him. The first blow was struck with Fernelius lying on the floor, his head a little bit raised. Peirce started hitting him over the head with his club and Hancock who was standing was hitting him over the head from the side. After half a dozen blows or better they got the handcuffs on one wrist and Fernelius started to pull himself up to a half sitting position and ''Peirce started hitting him again with the club and then Fernelius just settled back and started shaking . . . he was quivering and he fell back and he quieted down. . . . During the first series of those blows, the first few blows sounded hard and they started softening up like a soft football, like a squash and that is when he fell back.''

A number of other witnesses who were in cells beyond sight of the encounter testified to hearing blows both before and after a click as of handcuffs being locked.

All of these witnesses for the people who testified to seeing or hearing the affray were prisoners in the jail at the time and many of them had been convicted of felonies.

Appellants make no complaint of any ruling of the trial court. Their sole grounds of appeal are that the evidence is not sufficient to support the verdicts, and that the jury in arriving at the verdicts must have disregarded certain instructions of the court.

Appellants' points, while not separately stated, may be fairly segregated as follows:

1. The eye-witnesses for the people were all men of degraded character actuated by a feeling of malice against police officers and the hope of mitigation of their own punishments.

The attorneys for appellants were allowed the fullest latitude on cross-examination to develop the histories, convictions of felony, and charges pending as to all the people's witnesses. No complaint is made of any ruling of the court in this connection, and the jury was fully acquainted with the character of witnesses upon whose testimony the people were compelled to rely. The character and credibility of all witnesses is for the jury to decide. (*People* v. *Bond,* 13 Cal. App. 175 [109 Pac. 150].)

Besides the very nature and severity of the wounds and injuries received by the decedent, as testified to by medical witnesses whose characters were unimpeached, tended to contradict the stories told by the defendants on the stand

and to corroborate the testimony of the people's witnesses
as to the savageness and brutality of the beating administered
to Fernelius.

There is substantial evidence to support the verdicts which
seems in no way inherently improbable. It satisfied the
minds of the jurors in arriving at their verdicts and the
court in denying the motions for new trial. This court can-
not again reweigh the evidence on appeal. (*People* v. *Per-
kins*, 8 Cal. (2d) 502 [66 Pac. (2d) 631].)

2. Fernelius' skull was abnormally thin and the jury
must have disregarded that fact in reaching their verdicts.

Dr. Moore, one of the people's medical witnesses, testified
that "it would take a severe blow to produce the brain
damage that was present . . . the fracture is not of moment."

There is no evidence that Fernelius' scalp was abnormal
and he suffered at least two blows from a blunt instrument
severe enough to lay his scalp open to the bone. The frac-
ture ran through almost the thickest part of the skull at
the point of its apparent origin. In addition the injury
to the brain was of the contre-coup type, that is the brain
was damaged by striking the inside of the skull on the op-
posite side of the head from the point where the head was
struck, and not by the direct application of the blow through
the skull to the brain at the point of impact.

The jury was instructed that if defendants used reason-
able means to subdue Fernelius and the use of such means
resulted in his death because of the abnormal thinness of
his skull they must find the defendants not guilty.

There is nothing in the record to suggest that they dis-
regarded this instruction. The evidence above recited was
ample to support a finding that the thinness of Fernelius'
skull did not contribute in any way to his death.

3. It is further claimed that the jury must have dis-
regarded certain instructions of which the following are
typical:

a. "You are further instructed that a policeman, as a
peace officer, in making the arrest of a person for a felony,
may use such force as is necessary to arrest such felon, even
to the extent of killing him when he is in flight."

b. "You are further instructed that if you find that the
deceased, Fred Fernelius, was in the act of attempting to
escape from the Oakland City Jail . . . it then became the
immediate duty of the defendants, August D. Peirce and

Glenn Hancock as peace officers, to subdue Fred Fernelius, and in accomplishing this result both August D. Peirce and Glenn Hancock had the right to use any amount of force that appeared to be reasonably necessary to either of them.''

c. ''You are hereby instructed that homicide is justifiable when committed by public officers and those acting by their command in their aid and assistance either when necessarily committed in the discharge of any legal duty or when necessarily committed in arresting persons charged with felony and who are fleeing from justice or resisting such arrest. Homicide is also justifiable when committed by any person in either of the following cases, first, when resisting any attempt to murder any person or to commit a felony, or to do some great bodily injury upon any person, or, second, when committed in defense of person against one who manifestly intends or endeavors by violence or surprise to commit a felony, or, three, when committed in the lawful defense of such person when there is reasonable grounds to apprehend a design to commit a felony or to do some great bodily injury and imminent danger of such design being accomplished, or, four, when necessarily committed in attempting by lawful ways and means to apprehend any person for any felony committed or in lawfully suppressing any riot or in lawfully keeping and preserving the peace.''

These, and similar instructions, may be considered together in the light of the evidence before the jury. Fernelius was unarmed. The only injuries received by Peirce were a slightly lacerated ear and minor scratches and bruises for the treatment of which he did not even consult a doctor. Hancock suffered no injury. There was also evidence from which the jury could find that defendants continued to club Fernelius after he was handcuffed and lying helpless on the floor when there could no longer be any possibility of his escape or of his seriously injuring either officer.

The jury may well have found under the evidence that there was no real or apparent necessity to beat Fernelius at all, or none to beat him fatally, or that the fatal blows were struck after the necessity real or apparent, if any, had ceased to exist.

4. It is suggested that appellants feared a general jail break and so were justified in what they did. No authority is cited to the proposition that officers may beat a

prisoner to death because they fear that his unruly conduct may perhaps incite other prisoners to attempt to escape from jail and apparently no instruction was tendered on that subject. But the jury may well have found that neither officer actually feared a jail break. There was no evidence of any act of any other prisoner which could possibly suggest any idea of attempting to escape, and neither of the defendants nor any other officer in the jail made any move to guard any doors, or to take any other step to thwart a jail break if one was attempted. And again we have the evidence that both officers continued to club Fernelius about the head after he had been reduced to helplessness.

5. That in any event there is no evidence to support the verdicts against Hancock.

Hancock testified that he struck only one light blow on Fernelius' head. The witness Hellman testified that after Fernelius fell on his back on the floor both defendants were still striking him. "I was watching them hit him on the head. . . . He was laying on the floor on his back." After the handcuffs were put on him "they continued to strike . . . Fernelius upon the head with their night sticks. . . . It seemed that Peirce put in more blows than Hancock."

The witness Peterson testified: "Q. Now after they got the handcuff on Fernelius then what happened?

"A. His leg slipped or something and I guess—I could see just as he slipped, why, Hancock hit him and then Peirce hit him.

" . . . Q. After the handcuff was on, the handcuff was put on as I understand when he was down in a sitting position on the ground?

"A. Yes sir.

"Q. After that handcuff was on you saw more blows struck by Peirce and Hancock did you?

"A. Yes sir. I only saw Hancock hit him one time."

The witness Santos testified that no blows were struck until Peirce had pulled Fernelius to the floor and gotten on top of him. Fernelius was lying with his back on the floor. The defendants then began to strike him. "After the first series of blows were struck he passed out." They got the handcuff on one wrist and Fernelius pulled himself partly to a sitting position. "He was trying to break away and they clubbed him again."

The jury could well find that Hancock as well as Peirce struck one or more severe blows on Fernelius' head after he was in a helpless position on the floor.

An examination of the transcript convinces us that the evidence supports the judgments of conviction of both appellants.

The judgments and the orders denying appellants' motions for new trial are affirmed.

Nourse, P. J., and Sturtevant, J., concurred.

A petition for a rehearing was denied September 30, 1941, and appellants' petition for a hearing by the Supreme Court was denied October 14, 1941.